TEXAS AMERICAN ASPHALT CORPO-
RATION, Plaintiff,

v.

Charles J. WALKER, Sr., and C. M. Maier, Defendants.

Civ. A. No. 12622.

United States District Court
S. D. Texas,
Houston Division.

Sept. 18, 1959.

John Peace and Bradford F. Miller, San Antonio, Tex., E. J. Dryer, Washington, D. C., Fulbright, Crooker, Freeman, Bates & Jaworski, W. N. Arnold, Jr., Houston, Tex., for plaintiff.

George Cochran Doub, Asst. Atty. Gen., and Donald B. MacGuineas, Atty., Dept. of Justice, Washington, D. C., William B. Butler, U. S. Atty., Houston, Tex., for defendants.

INGRAHAM, District Judge.

Plaintiff, a Texas corporation which operates a petroleum refinery at Lacoste, Texas, for the production of asphalt, seeks to enjoin the Collector and Deputy Collector of Customs at Galveston and Houston, Texas, from preventing plaintiff from importing Venezuelan crude oil in noncompliance with the Mandatory Oil Import Program promulgated by the President in Proclamation 3279, issued March 10, 1959 (24 F.R. 1781), 19 U.S. C.A. § 1352a note. Plaintiff also seeks a declaratory judgment that it is entitled to import such crude oil at the rate of 10,000 barrels per day.

Proclamation 3279 was issued by the President pursuant to Section 8 of the Act of August 20, 1958 (72 Stat. 673, 678–679).[1] That section authorizes the Director of the Office of Civil and Defense Mobilization to make investigations to determine the effects on the national security of imports of articles and, if the Director is of the opinion that a particular article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security, he shall so advise the President, and the President, unless he determines that the article is not being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security, shall take such action as he deems necessary to adjust the imports of such article and its derivatives so that such imports shall not so threaten to impair the national security.

The statute provides that the Director and the President in taking such action shall give consideration to a number of stated factors, such as the domestic production needed for projected national defense requirements, the capacity of domestic industries to meet such requirements, the existing and anticipated availabilities of products essential to the national defense, the requirements of growth of such industries, the effect of the importation of goods upon such industries and the capacity of the United States to meet national security requirements, and the effects resulting from displacement of any domestic products by excessive imports.

On January 28, 1959, the Director of the Office of Civil and Defense Mobilization published in the Federal Register, in accordance with regulations which he had issued providing that upon public notice of his undertaking an investigation under this statute any interested party might submit comment, opinion, or data, a notice that he was undertaking an investigation with respect to imports of crude oil pursuant to a request by the Secretaries of State and Defense (24 F.R. 601–2, 619).

Following such investigation, the Director of the Office of Civil and Defense

---

1. This section of the Act of August 20, 1958, is an amendment of Section 2 of the Act of July 1, 1954, as amended by Section 7 of the Trade Agreements Extension Act of 1955 (19 U.S.C.A. § 1352a).

Mobilization informed the President that on the basis of his study of the relationship of oil imports to the national security he had determined that imports of excessive quantities of low-priced oils from foreign sources, where production costs are substantially lower than in this country, were bringing about a decline in exploratory drilling in the United States; and that this trend was upsetting a reasonable balance between imports and domestic production, with deleterious effect upon the adequate exploration and development of additional reserves in this country. The Director concluded that crude oil and its derivatives and products "are being imported in such quantities and under such circumstances as to threaten to impair the national security."

On March 6, 1959, a Special Committee to Investigate Crude Oil Imports (composed of the Acting Secretary of State, the Secretary of Defense, the Secretary of the Treasury, the Secretary of the Interior, the Secretary of Labor, and the Secretary of Commerce) recommended to the President that in the light of this conclusion of the Director of the Office of Civil and Defense Mobilization the Voluntary Oil Import Program then in effect (referred to in Executive Order 10761, March 27, 1958, 23 F.R. 2067) 41 U.S.C.A. § 10d note [2] be replaced by a mandatory program which would limit the imports of crude oil and derivatives to such levels as the national security requires and would allocate such imports among companies in a fair and equitable manner.

Proclamation 3279 recites that the President and the Director of the Office of Civil and Defense Mobilization have considered the matters which the statute requires them to consider, that the President agrees with the conclusion of the Director of the Office of Civil and Defense Mobilization that crude oil and its principal derivatives and products are being imported in such quantities and under such circumstances as to threaten to impair the national security, and that the President finds that adjustments must be made in imports of crude oil, unfinished oils, and finished products so that they will not threaten to impair the national security; and it provides that after March 11, 1959, no crude oil or unfinished oils may be entered for consumption or withdrawn from warehouse for consumption except by or for the account of a person to whom a license has been issued by the Secretary of the Interior pursuant to an allocation made by the Secretary in accordance with regulations to be issued by him.

The Proclamation also provides that in Districts I–IV (continental United States east of the Rocky Mountains) the maximum level of imports of crude oil, etc., shall be approximately 9% of the total demand in these districts, as estimated by the Bureau of Mines for periods fixed by the Secretary of the Interior; and that additional imports of crude may be permitted "as are necessary to meet the minimum requirements of refiners, and pipeline companies using crude oil directly as fuel, which are not able to obtain sufficient quantities of domestic crude oil by ordinary and continuous means, such as by barges, pipelines, or tankers." The Proclamation authorizes the Secretary of the Interior to issue implementing regulations, consistent with the import levels established in the Proclamation, which shall provide for a system of allocation of authorized

2. In this Executive Order the President determined that essential national security interests were adversely affected by the purchase by the United States of crude petroleum imported in quantities in excess of those specified under the voluntary program or of petroleum products refined in the United States in whole or in part from imported crude petroleum and requested the heads of all executive departments and agencies to apply the Buy American Act (41 U.S.C.A. § 10a–10d) so that unless a domestic product was unavailable or the cost unreasonable the Government would purchase petroleum products made from imported crude only if such crude had been imported in compliance with the Voluntary Oil Import Program.

imports of crude oil and the issuance of licenses. Such regulations are required by the Proclamation to "provide, to the extent possible, for a fair and equitable distribution among persons having refinery capacity in these districts in relation to refinery inputs during an appropriate period or periods selected by the Secretary * * *."

The Proclamation further authorizes the Secretary of the Interior to establish an Appeals Board, comprised of officials of the Departments of the Interior, Defense, and Commerce of the rank of Deputy Assistant Secretary or higher, which may be empowered "on grounds of hardship, error, or other relevant consideration * * * to grant allocations of crude oil and unfinished oils in special circumstances to persons with importing histories who do not qualify for allocations under such regulations." [3]

On March 13, 1959, the Secretary of the Interior issued implementing regulations (24 F.R. 1907) which provide that allocations of imports of crude oil would initially be made for the period March 11–June 30, 1959, and would thereafter be made for six months' periods; that a person is not eligible for an allocation to import crude oil during the period ending June 30, 1959, unless he had refinery inputs during 1958; [4] and that when an allocation is made to a person the Oil Import Administrator issues a license based on the allocation specifying the amount of crude oil which may be imported during a prescribed period of time and a copy of such license is sent to the Collector of Customs at the stated port of entry.

Plaintiff corporation was organized in September 1958 with a total capitalization of $1,000 by James A. Clements, who is the corporation's president. In November 1957 he had acquired a lease of oil producing properties in the Taylor-Ina Field in Medina County, Texas. After drilling some wells on this property, which produce an asphaltic type of crude, Clements found that he could not market his oil profitably and decided to construct a refinery near the Taylor-Ina Field to produce asphalt from this crude. Clements had no experience in producing asphalt and only limited experience in operating a refinery. After making plans for the construction of a refinery at Lacoste, approximately twelve miles from the Taylor-Ina Field, Clements learned that not all asphaltic crude would make asphalt meeting specifications for road building, etc. Plaintiff also made plans for the construction of a second refinery at Ennis, Texas, designed to make asphalt from petroleum produced in fields in Titus County, Texas. [5] Clements then learned that he could not obtain crude from these fields because the producers felt it would be injurious to their reserves to increase their production, which was already committed to others.

After plaintiff started to purchase materials for the construction of its refinery at Lacoste, Clements learned, early in November 1958, that the Taylor-Ina crude would not make specification asphalt products unless that crude was mixed with other crudes produced at the Rinehart Field. Clements also learned that he could obtain from the Cactus Petroleum Company, which gathered the oil from the wells in the Taylor-Ina and Rinehart Fields, only about 920 barrels of crude a day, whereas plaintiff's Lacoste refinery is designed to take in 1,500 barrels per day. About this time

---

3. The President, when he promulgated Proclamation 3279, issued a public statement that: "The new program is designed to insure a stable, healthy industry in the United States capable of exploring for and developing new hemisphere reserves to replace those being depleted. The basis of the new program, like that for the voluntary program, is the certified requirements of our national security which make it necessary that we preserve to the greatest extent possible a vigorous, healthy petroleum industry in the United States."

4. Under the regulations, to be eligible for an allocation for the six months' periods beginning July 1, 1959, a refinery must have inputs during the twelve months ending three months prior to the beginning of a particular allocation period.

5. This proposed refinery has not been constructed.

Clements also discovered that the crude from the Fair Field in Bexar County, Texas, which he initially thought would be suitable for plaintiff's operations, was not suitable. Clements then retained a petroleum consultant who recommended to plaintiff that the best crude available to it for the production of asphalt was Bachaquero, an asphaltic type crude produced in Venezuela.

In November 1958 Clements discussed his problem with the Administrator of the Voluntary Oil Import Program in Washington. The Administrator told Clements that the cabinet committee was then studying the question as to whether there should be a new oil import program; that he (the Administrator) saw no way under the voluntary program or any revision of it by which plaintiff would ever get an allocation that would enable it to run entirely or substantially on imported crude and that he did not know what type of program might be adopted but that he was reasonably sure provision would be made in any such program for hardship cases and for newcomers.

On November 22, 1958, plaintiff wrote the Administrator of the voluntary program requesting permission to import 10,000 barrels per day of Bachaquero. The Administrator replied on December 8, 1958, that a revision of the voluntary program was pending and that "when the revised plan had been finalized" plaintiff would be given "the same consideration as other applicants."

About this time plaintiff abandoned its efforts to construct the Lacoste refinery itself and entered into a contract with a construction firm to erect the refinery for $210,000, using, where practicable, secondhand or salvaged material.[6]

Plaintiff did not avail itself of the opportunity to submit comments to the Director of Civil and Defense Mobilization in connection with his investigation of the effect of oil imports upon the national security. During the few months prior to the promulgation of the mandatory program, there was considerable comment in the petroleum industry trade journals about the likelihood of a mandatory program.

On January 30, 1959, plaintiff entered into a contract with Creole Petroleum Corporation for the purchase of Bachaquero crude for a ten-year term beginning March 1, 1959, in quantities of not less than an average of 10,000 barrels per day. This contract provides that in the event there should be any governmental restrictions or controls prohibiting plaintiff from importing into the United States the Bachaquero crude, plaintiff might "invoke force majeure and suspend lifting hereunder to the extent of the daily quantity of crude oil so affected." The Bachaquero costs plaintiff $3.17 per barrel, delivered to the Lacoste refinery. At the same time plaintiff contracted with a shipping company to provide tankers to transport the Bachaquero from Venezuela and contracted for terminal storage facilities at Houston to receive this oil.

On February 6, 1959, plaintiff informed the Administrator of the voluntary program that it had no record of past imports of crude oil. On March 18, 1959, a few days after the Mandatory Oil Import Program went into effect, plaintiff submitted to the Administrator of that program an application to import 220,000 barrels of Bachaquero crude during the initial allocation period of March 11–June 30, 1959, certifying that plaintiff did not import any petroleum in 1957 and had no refinery input in 1958. This application stated that it was being made under Section 12 of the regulations because of plaintiff's inability to obtain domestic crude by ordinary and continuous means, sufficient to meet its requirements.[7]

---

6. Plaintiff has not paid the contractor any part of the contract price.

7. Section 12 of the regulations provided: "(a) The Administrator may make a special allocation of imports of crude oil to any person having operating refinery capacity or having pipeline facilities using crude oil directly as fuel who, to

The Administrator denied plaintiff's application, on the ground that Section 12 of the regulations, as he construed it, permitted an allocation only where ordinary means of transportation were unavailable to supply a refinery with sufficient domestic crude, without regard to any particular type of crude desired by the refinery, and plaintiff's difficulty was not due to a lack of ordinary means of transportation of domestic crude to the Lacoste refinery. Plaintiff then appealed to the Oil Imports Board for an allocation under both Section 12 of the regulations and Section 21, which provides that the Appeals Board may, "on grounds of hardship, error, or other relevant special consideration * * * grant allocations of crude oil and unfinished oils in special circumstances to persons with importing histories who do not qualify for allocations under this regulation." The Appeals Board denied plaintiff appeal, on the ground that since plaintiff did not have an importing history the Board was not authorized to grant it an allocation.

At plaintiff's request the Secretary of the Interior reviewed the Administrator's interpretation of Section 12 of the regulations and confirmed his ruling, holding that Section 12 was not intended to authorize imports to satisfy the needs of persons who have designed refineries to operate on special types of foreign oil, but was applicable only when inadequacies of supply of domestic oil result from the lack of ordinary and continuous means of transportation, which was not plaintiff's case.

Plaintiff's Lacoste refinery is of a rudimentary type, a "skimming type" plant composed in part of secondhand materials. Heated crude oil is fed into the plant and fed off into fractionating towers, where it is distilled off at various levels to produce asphalt and so-called "light end" products, i. e., naphtha, kerosine, diesel fuel, and lube oil. Kerosine and diesel oil are finished products which can be sold and consumed without further refining. Plaintiff can further refine the lube oil into marketable lubricating oil. Naphtha, however, requires further refining to produce gasoline, which the Lacoste refinery is not equipped to perform. Although plaintiff could dispose of these products to other refiners, it plans to blend the naphtha and kerosine back into the asphalt to make specialty products.

Since plaintiff in constructing this refinery did not use noncorrosive type metals, it is to be anticipated that the refinery would suffer some corrosion damage even if it were to use Bachaquero exclusively, since that crude has a relatively high sulphur content (2.44%).

This refinery could operate with various types of domestic crude oil. If it used crude with a lesser asphalt content than Bachaquero (which is approximately 50%), it would produce a higher percentage of light end products and a smaller percentage of asphalt than if Bachaquero were used. The refinery could also operate with topped crude, i. e., crude from which the light ends have already been removed. The Cactus Petroleum Company is willing to provide plaintiff with approximately 920 barrels a day of domestic crude from the Taylor-Ina and Rinehart Fields provided plaintiff can give assurances of payment, which plaintiff has so far not done. There are other Texas and Mississippi crudes available to plaintiff, some of which have a higher asphaltic content than Bachaquero. The total cost of such crudes, delivered to the Lacoste refinery, is not established in the record, but it would probably be less economical for plaintiff to use these other domestic crudes than to use Bachaquero. It is questionable, however, whether plaintiff could operate profitably even if it used Bachaquero.

the satisfaction of the Administrator, shows inability to obtain quantities of domestic crude oil by ordinary and continuous means, such as barges, pipelines or tankers, sufficient to meet his minimum requirements. Such a special allocation shall be no larger than is required to meet the person's minimum requirements. A person who receives an allocation under this section shall not be entitled to an allocation under section 10 or section 11 of this regulation."

Under the mandatory program plaintiff can become eligible to receive import allocations for future allocation periods, based on inputs of crude into its Lacoste refinery. If plaintiff prefers to operate with foreign crude, it can acquire such crude from the holder of any import allocation by exchanging domestic crude for such foreign crude.

It would not be administratively feasible to have an oil import program tailored to each refiner's need or desire to import oil. To permit plaintiff to import Bachaquero under its contract would place it in a better position than that of other refiners, which are restricted to importing a small percentage of their refining inputs.

Other refiners are producing asphalt from domestic oil. The industry has the capacity to produce asphalt in quantities considerably in excess of demand. Thus, the national asphalt producing capacity is approximately 148,000,000 barrels per year, whereas the greatest amount used in any year so far is approximately 96,000,000 barrels. Refineries are able to vary, in accordance with seasonal demand, the percentage of their inputs made into asphalt. At the present time other Texas asphalt producers using Texas crude have surplus inventories of asphalt which the Texas market cannot absorb, they are not producing at maximum capacity, and they are compelled to absorb freight charges in order to sell asphalt in mid-western states. There is no indication that the demand for asphalt in Texas will increase substantially in the near future. Hence, any asphalt produced by plaintiff from Bachaquero and sold would displace in the market asphalt of other producers and thereby tend to reduce the demand for domestic crudes.

The only defendants in this action are the Collector and Deputy Collector of Customs at Galveston and Houston. They have nothing to do with the administration of the Mandatory Oil Import Program except to see to it that oil is imported into this country only under a license granted by the Secretary of the Interior or subordinates to whom he has delegated that authority. Plaintiff does not specifically challenge the validity of the provision in Proclamation 3279 that no crude oil may be imported except by or for the account of a person to whom the Secretary of the Interior has issued a license pursuant to an allocation made to such person by the Secretary in accordance with his regulations. In any event, I perceive no ground upon which such requirement of an import license could be invalid in and of itself. For the court to issue an injunction against the defendants which would enable plaintiff to import oil without a license and allocation would be to nullify and invalidate the license requirement of the Proclamation. Any relief which this court can grant must, therefore, be consonant with that provision of the Proclamation.

This court obviously has no authority to give plaintiff any import allocation or license. Under the Proclamation and regulations, that can be done only by the Administrator or the Appeals Board. The issuance of an import license and allocation to plaintiff is not a judicial function but an administrative one which Congress has delegated to the President, he has delegated to the Secretary of the Interior, and the Secretary has delegated to the Administrator and Appeals Board under prescribed conditions. Where, as here, the legality of administrative determinations is in issue, the judicial function is limited to deciding, in an appropriate case, whether the Administrator or the Appeals Board has committed an error of law and, if so, to remanding the case to one of them for reconsideration in the light of the court's rulings of law. Federal Power Commission v. Idaho Power Co., 344 U.S. 17, 20–21, 73 S.Ct. 85, 97 L.Ed. 15; Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 141–146, 60 S.Ct. 437, 84 L.Ed. 656; United States v. Jones, 336 U.S. 641, 652, 670–673, 69 S.Ct. 787, 93 L.Ed. 938; Securities and Exchange Commission v. Chenery Corporation, 318 U.S. 80, 94–95, 63 S.Ct. 454, 87 L.Ed. 626; Securities and Exchange Commission v. Chenery

Corporation, 332 U.S. 194, 200–201, 67 S.Ct. 1575, 1760, 91 L.Ed. 1995; Perkins v. Elg, 307 U.S. 325, 349–350, 59 S.Ct. 884, 83 L.Ed. 1320. See also Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 54–55, 68 S.Ct. 822, 92 L.Ed. 1196; Ford Motor Co. v. National Labor Relations Board, 305 U.S. 364, 372–374, 59 S.Ct. 301, 83 L.Ed. 221; Federal Power Commission v. Pacific Power & Light Co., 307 U.S. 156, 159–160, 59 S.Ct. 766, 83 L.Ed. 1180; Far East Conference v. United States, 342 U.S. 570, 573–575, 72 S.Ct. 492, 96 L.Ed. 576; Federal Maritime Board v. Isbrandtsen Company, 356 U.S. 481, 496–498, 78 S.Ct. 851, 2 L.Ed.2d 926; Southwestern Sugar & Molasses Co., Inc. v. River Terminals Corporation, 360 U.S. 411, 79 S.Ct. 1210, 3 L.Ed.2d 1334. For this court to grant an allocation to plaintiff would be to "(usurp) an administrative function * * * the function of the reviewing court ends when an error of law is laid bare. At that point the matter once more goes to the Commission for reconsideration." Federal Power Commission v. Idaho Power Co., 344 U.S. 17, 20, 73 S.Ct. 85, 87, 97 L.Ed. 15.[8]

Plaintiff relies upon Williams v. Fanning, 332 U.S. 490, 68 S.Ct. 188, 189, 92 L.Ed. 95, which held that a suit to enjoin the enforcement of a fraud order issued by the Postmaster General might be maintained against the Postmaster at Los Angeles without joining the Postmaster General, since the District Court could "effectively grant the relief desired by expending itself on the subordinate official who is before the court." In that case, however, the Supreme Court recognized "the principle that the superior officer is an indispensable party if the decree granting the relief sought will require him to take action, either by exercising directly a power lodged in him or by having a subordinate exercise it for him." A case cited in Williams v. Fanning as illustrating that principle is

Gnerich v. Rutter, 265 U.S. 388, 44 S.Ct. 532, 68 L.Ed. 1068. In that case suit was brought to enjoin the federal prohibition director for California from enforcing an allegedly illegal restriction embodied in a permit issued by a general agent of the Commissioner of Internal Revenue in Washington to the plaintiffs to sell intoxicating liquors for other than beverage purposes. The plaintiffs could not lawfully sell liquor without such a permit, and the subordinate official who was the defendant in that action had no authority to grant the desired permit. Hence, the Commissioner of Internal Revenue was held to be an indispensable party.

Gnerich v. Rutter, supra, is controlling here. Plaintiff may not lawfully import oil without obtaining a license and allocation from the Secretary of the Interior or his subordinates in Washington, just as in Gnerich the plaintiffs could not lawfully sell liquor except under a permit issued by an official in Washington. In Williams v. Fanning, the plaintiff did not, of course, need any license from the Postmaster General to use the mails.

Williams v. Fanning has been distinguished in many cases involving situations analogous to that present here. In Davis v. Trigo Bros. Packing Corp., 1 Cir., 266 F.2d 174, 179, in which suit was brought against the local supervisor of the Alcohol and Tobacco Tax Division of the Internal Revenue Service challenging the applicability to the plaintiff of wine bottling regulations promulgated under the Federal Alcohol Administration Act, 27 U.S.C.A. § 201 et seq., it was held that since the plaintiff could not lawfully bottle wine without either a permit or an exemption certificate issued by the Director of the Alcohol and Tobacco Tax Division in Washington, the Director was an indispensable party. The court said:

"* * * It follows that the officer from whom the plaintiff must obtain relief, if plaintiff is to have

8. Nor can I direct the Administrator or the Appeals Board to issue an allocation and license to plaintiff. They are not parties to this action and being of-

ficially resident in Washington, D. C., are not suable in this District. Blackmar v. Guerre, 342 U.S. 512, 515–516, 72 S.Ct. 410, 96 L.Ed. 534.

it, is the Director of the Alcohol and Tobacco Tax Division in Washington. It is obvious that an injunction against the supervisor in Puerto Rico, the only defendant before the court in this suit, would not afford plaintiff the relief it seeks. For such an injunction could not direct the issuance of the necessary certificate of exemption, nor vacate the Director's denial of such a certificate * * * It will thus be seen that the case is clearly distinguishable from Williams v. Fanning."

Again, in Richman v. Beck, 10 Cir., 257 F.2d 575, in which a sheep rancher sought to enjoin local officials of the Bureau of Land Management of the Department of the Interior from interfering with his claimed right to trail his sheep across certain public lands, it was held that since the plaintiff could not lawfully exercise his claimed right without a permit from the Secretary of the Interior or his subordinates, the Secretary was an indispensable party. See also Sellas v. Kirk, 9 Cir., 200 F.2d 217, 220; Payne v. Fite, 5 Cir., 184 F.2d 977, 980; Rogers v. Skinner, 5 Cir., 201 F.2d 521, 523–524; Stroud v. Benson, 4 Cir., 254 F.2d 448; Jacobs v. Office of Housing Expediter, 7 Cir., 176 F.2d 338; Money v. Wallin, 3 Cir., 186 F.2d 411; Daggs v. Klein, 9 Cir., 169 F.2d 174; Schustack v. Herren, 2 Cir., 234 F.2d 134; Bernstein v. Herren, 2 Cir., 234 F.2d 434.[9]

■ Accordingly, since plaintiff cannot lawfully import oil without an allocation and license from the Administrator or the Appeals Board, they are indispensable parties, and this action must be dismissed for failure to join them.

■ Upon the basis of the verified allegations of the complaint that plaintiff had a tanker of imported oil at Houston ready for unloading, that plaintiff's refinery could not operate without that oil,

and that plaintiff would probably become insolvent if denied immediate use of such oil, the court issued a temporary restraining order enjoining defendants from refusing to permit the importation of the oil in that particular tanker. Plaintiff has since moved approximately 40,000 barrels of this imported oil to its refinery and the balance remains in storage at Houston.

Since I have determined that this action must be dismissed, it would be inequitable to permit plaintiff to retain the benefits of the temporary restraining order which it obtained and to use the oil which it imported thereunder. The Government is entitled to restitution, insofar as that is now possible, of what it has lost as a result of the issuance of the temporary restraining order. Mitchell v. Riegel Textile, Inc., 104 U.S.App.D.C. 139, 259 F.2d 954; Arkadelphia Milling Co. v. St. Louis Southwestern Ry. Co., 249 U.S. 134, 145–146, 39 S.Ct. 237, 63 L.Ed. 517; Baltimore & Ohio R. Co. v. United States, 279 U.S. 781, 785–786, 49 S.Ct. 492, 73 L.Ed. 954; Public Service Commission of State of Missouri v. Brashear Freight Lines, Inc., 312 U.S. 621, 629, 61 S.Ct. 784, 85 L.Ed. 1083. See also Inland Steel Co. v. United States, 306 U.S. 153, 158, 161, 59 S.Ct. 415, 83 L.Ed. 557; United States v. Morgan, 307 U.S. 183, 193–194, 197–198, 59 S.Ct. 795, 83 L.Ed. 1211.

Such restitution can best be accomplished by requiring plaintiff to put into bonded warehouse storage, in accordance with 19 U.S.C.A. § 1555 and customs regulations issued thereunder, the portion of the imported oil which is still in storage at Houston. I shall enter an order to that effect.

In view of the likelihood that an appeal will be taken in this case, it seems to me advisable to rule on the merits of plaintiff's claim, even though the action must be dismissed for lack of indispensable parties.

---

9. As shown by these cases and Blackmar v. Guerre, 342 U.S. 512, 515–516, 72 S.Ct. 410, 96 L.Ed. 534, neither the Declaratory Judgment Act (28 U.S.C. § 2001) nor the Administrative Procedure Act (5 U.S.C.A. § 1009) dispenses with the doctrine of indispensable parties.

Plaintiff was not entitled to an import allocation under the provisions of Proclamation 3279 and the implementing regulations providing for allocations for the period March 11–June 30, 1959, to persons who had refining inputs in 1958, since construction of the Lacoste refinery was not completed until 1959 and plaintiff had, of course, no inputs in 1958.

█ Plaintiff's contention that it was entitled to an allocation under the provisions of the Proclamation and Section 12 of the regulations authorizing allocations of imports of crude by a refiner who is unable "to obtain quantities of domestic crude oil by ordinary and continuous means, such as barges, pipelines or tankers, sufficient to meet his minimum requirements," turns upon the correctness of the Administrator's and the Secretary's construction of those provisions as not applicable to plaintiff's situation. Their administrative construction is entitled to considerable weight, and I should accept that construction unless it is shown to be clearly erroneous. Federal Trade Commission v. Mandel Bros., Inc., 359 U.S. 385, 79 S.Ct. 818, 3 L.Ed.2d 893; Federal Housing Administration v. The Darlington, Inc., 358 U.S. 84, 90, 79 S.Ct. 141, 3 L.Ed.2d 132; United States v. American Trucking Associations, 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345.

█ The record establishes that these provisions were placed in the Proclamation and regulations to meet the peculiar situation of certain refineries in the northern states which refine Canadian crude oil delivered to them by pipelines. They have no pipeline connections with domestic oil fields, and although they can be supplied with domestic oil by barges or tankers in the summer months, this source of supply is cut off in the winter when the Mississippi River and the Great Lakes are frozen. Accordingly, these provisions of the Proclamation and the regulations were intended to apply only where a refiner's inability to obtain sufficient quantities of domestic crude was due to lack of continuous means of transportation to his refinery, without regard to his need or preference for any particular type of crude.

█ It is clear that the Lacoste refinery could obtain domestic crudes by ordinary and continuous means of transportation. Plaintiff's problem was thus caused not by a lack of transportation but by its desire to use Bachaquero instead of domestic crudes, because it considered that it could produce asphalt more efficiently and economically from Bachaquero than from domestic crudes. Accordingly, the Administrator and the Secretary correctly construed these provisions of the Proclamation and the regulations as not applicable to plaintiff's situation, and plaintiff is not entitled to an allocation under them.

The correctness of the Administrator's and the Secretary's construction of these provisions of the Proclamation and the regulations is confirmed by the fact that on April 30, 1959, the President promulgated Proclamation 3290 (24 F.R. 3527), which amended Proclamation 3279, effective June 1, 1959, to eliminate Canadian and Mexican crude brought into the United States by pipelines or other overland means from the restrictions of the mandatory oil import program and to revoke the provision of Proclamation 3279 authorizing allocations to refiners who cannot obtain sufficient quantities of domestic crude by ordinary means of transportation.[10]

Plaintiff alternatively claims that the Appeals Board should have given it an allocation under the provisions of the Proclamation and Section 21 of the regulations which empower the Appeals Board "on grounds of hardship, error, or other relevant consideration * * * to

---

10. On June 6, 1959, the Secretary of the Interior issued revised oil import regulations (24 F.R. 4654) which, consistently with the change made by Proclamation 3290, revoked Section 12 of the original regulations. The elimination of these provisions of Proclamation 3279 and of the original regulations renders moot any claim which plaintiff might have to an allocation thereunder for any allocation period subsequent to June 30, 1959.

grant allocations of crude oil and unfinished oils in special circumstances to persons with importing histories who do not qualify for allocations under this regulation."

■ The Appeals Board can grant allocations under these provisions only to refiners "with importing histories." Plaintiff, however, does not have an actual history of imports. The fact that it had planned its refinery to operate on imported crude and had entered into a contract for the importation of Bachaquero prior to the effective date of the mandatory program does not equate it with a refiner who had actually imported oil prior to the program and who hence has an importing history. Plaintiff, therefore, is not entitled to an allocation under Section 21 of the regulations and the corresponding provision of Proclamation 3279.

Finally, plaintiff contends that if the Administrator, the Appeals Board, and the Secretary properly construed the Proclamation and the regulations as not entitling plaintiff to an import allocation, they are invalid as denying plaintiff due process of law.

■ Neither plaintiff nor anyone else "can be said to have a vested right to carry on foreign commerce with the United States." Board of Trustees of University of Illinois v. United States, 289 U.S. 48, 56–57, 53 S.Ct. 509, 510, 77 L.Ed. 1025; The Abby Dodge, 223 U.S. 166, 176–177, 32 S.Ct. 310, 56 L.Ed. 390; Buttfield v. Stranahan, 192 U.S. 470, 493, 24 S.Ct. 349, 48 L.Ed. 525. Section 8 of the Act of August 20, 1958, under which the President issued Proclamation 3279, leaves entirely to his discretion the particular manner in which imports of a

commodity shall be controlled, once he determines that such control is necessary to protect the national security.[11]

■ The President had determined that it is fair and equitable to allocate permissible imports of crude oil generally among refiners on the basis of their prior history of refinery inputs. This basis for allocation cannot be said to be so arbitrary or capricious as not to be within the wide discretion which the Act gives to the President or as to deny plaintiff due process of law. The Supreme Court has upheld as constitutional other exercises of the commerce power controlling commerce in commodities by systems under which producers or processors are given quotas based on the extent of their prior dealings in the commodity, even although it is apparent that such controls will inevitably work severe hardship upon particular members of the industry affected. Thus, as stated in Secretary of Agriculture v. Central Roig Refining Co., 338 U.S. 604, 617–619, 70 S.Ct. 403, 410, 94 L.Ed. 381:

"Congress was thus confronted with the formulation of policy peculiarly within its wide swath of discretion. It would be a singular intrusion of the judiciary into the legislative process to extrapolate restrictions upon the formulation of such an economic policy from those deeply rooted notions of justice which the Due Process Clause expresses. To fix quotas on a strict historical basis is hard on latecomers into the industry or on those in it who desire to expand. On the other hand, to the extent that newcomers are allowed to enter or oldtimers to expand there must either

---

11. The soundness of the President's judgment that the facts call for the application of his statutory authority to restrict oil imports is not subject to judicial review. United States v. George S. Bush & Co., 310 U.S. 371, 379–380, 60 S.Ct. 944, 84 L.Ed. 1259; Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297, 303, 64 S. Ct. 95, 88 L.Ed. 61; United States v. Chemical Foundation, 272 U.S. 1, 15, 47 S.Ct. 1, 71 L.Ed. 131; Dakota Central Telephone Company v. State of South Dakota, 250 U.S. 163, 184, 39 S.Ct. 507, 63 L.Ed. 910; Luther v. Borden, 7 How. 1, 43–44, 12 L.Ed. 581; Martin v. Mott, 12 Wheat. 19, 29–32, 6 L.Ed. 537.

be an increase in supply or a reduction in the quotas of others. * * *

"Suffice it to say that since Congress fixed the quotas on a historical basis it is not for this Court to reweigh the relevant factors and, perchance, substitute its notion of expediency and fairness for that of Congress. This is so even though the quotas thus fixed may demonstrably be disadvantageous to certain areas or persons. This Court is not a tribunal for relief from the crudities and inequities of complicated experimental economic legislation. * * *

* * * ' * * *

" * * * The Act may impose hardships here and there; the incidence of hardship may shift in location and intensity. It is not for us to have views on the merits of this legislation. It suffices that we cannot say, as we cannot, that there is 'discrimination of such an injurious character as to bring into operation the due process clause.' Currin v. Wallace, 306 U.S. 1, 14, 59 S. Ct. 379, 386, 83 L.Ed. 441. * * *"

See also Wickard v. Filburn, 317 U.S. 111, 129, 63 S.Ct. 82, 87 L.Ed. 122.

Obviously it would not be feasible to regulate an industry of the magnitude and complexity of the petroleum industry by making special provision to meet the needs or desires of every refiner who happens to find himself in a difficult situation, as a result of the application of the mandatory program to him. This program, in denying refineries generally the economic advantage of using large quantities of imported crude, which is substantially cheaper than domestic crude, necessarily imposes hardship in varying degrees upon the entire industry. That is the price which it must pay in the interest of the national security.

Plaintiff's unfortunate predicament may be laid largely to its own lack of sound business judgment in constructing its Lacoste refinery without an assured supply of nearby domestic crude and in failing to appreciate the risk involved in assuming that it would be able to import as much crude as it might desire. But even if plaintiff were wholly blameless for its plight, the due process clause would not guarantee it against injury to, or even loss of, its business as a result of governmental controls of oil imports. Everyone is subject to the risk of injury from the exercise of governmental authority. As stated in Norman v. Baltimore & Ohio R. Co., 294 U.S. 240, 305, 55 S.Ct. 407, 415, 79 L.Ed. 885: "A new tariff, an embargo, or a war, might bring upon individuals great losses; might, indeed, render valuable property almost valueless—might destroy the worth of contracts. 'But whoever supposed' asked the Court, 'that, because of this, a tariff could not be changed or a nonintercourse act, or embargo be enacted, or a war be declared.' " See also Fleming v. Rhodes, 331 U.S. 100, 107, 67 S.Ct. 1140, 91 L. Ed. 1368; East New York Savings Bank v. Hahn, 326 U.S. 230, 232, 66 S.Ct. 69, 90 L.Ed. 34.

Many companies, indeed whole industries, have been forced out of business by governmental regulation. That regrettable consequence does not, however, establish a denial of due process. See Walls v. Midland Carbon Co., 254 U.S. 300, 41 S.Ct. 118, 65 L.Ed. 276; Ohio Oil Co. v. State of Indiana (No. 1), 177 U.S. 190, 20 S.Ct. 576, 44 L.Ed. 729; Mugler v. State of Kansas, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205; Jacob Ruppert, Inc. v. Caffey, 251 U.S. 264, 40 S.Ct. 141, 64 L.Ed. 260; Hamilton v. Kentucky Distilleries, 251 U.S. 146, 40 S.Ct. 106, 64 L.Ed. 194; Powell v. Commonwealth of Pennsylvania, 127 U.S. 678, 8 S.Ct. 992, 1257, 32 L.Ed. 253; Austin v. State of Tennessee, 179 U.S. 343, 21 S.Ct. 132, 45 L.Ed. 224; Murphy v. State of California, 225 U.S. 623, 32 S.Ct. 697, 56 L.Ed. 1229; Miller v. Schoene, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568; Pierce Oil Corporation v. City of Hope, 248 U.S. 498, 39 S.Ct. 172, 63 L.Ed. 381; Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369; Mulford v. Smith, 307 U.S. 38, 49–51, 59 S.Ct. 648, 83 L.Ed. 1092; Bowles v. Willingham,

**328**

321 U.S. 503, 517–518, 64 S.Ct. 641, 88 L.Ed. 892; United States v. Central Eureka Mining Co., 357 U.S. 155, 168, 78 S.Ct. 1097, 2 L.Ed.2d 1228.

Accordingly, the application of the mandatory oil import program to plaintiff does not deny it due process of law.

This opinion shall constitute the court's findings of fact and conclusions of law.

True copies hereof shall be forwarded by the clerk to the attorneys of record, who will draft and submit judgment accordingly.