**EASTERN STATES PETROLEUM & CHEMICAL CORPORATION,**
Plaintiff,

v.

**Fred A. SEATON et al., Defendants.**
Civ. A. No. 1621–58.

United States District Court
District of Columbia,
Civil Division.
Aug. 15, 1958.

See, also, 163 F.Supp. 797.

Meyers & Batzell, Washington, D. C., for plaintiff.

Donald MacGuineas, Department of Justice, Washington, D. C., for defendants.

YOUNGDAHL, District Judge.

Plaintiff seeks to enjoin the cancellation of two Government procurement contracts and any discrimination in the future in its sales to the Government because of its importation of oil above its allotted quota under the Voluntary Oil Import Program. The facts giving rise to this request for relief are as follows:

On April 23, 1957, pursuant to Section 7 of the Trade Agreements Extension Act of 1955,[1] the Director of the Office of Defense Mobilization advised the President that he had reason to believe crude oil was being imported into the United States in such quantities as to threaten to impair the national security. The President, in agreement that there was reason for such belief, established, on June 26, 1957, the Special Committee to Investigate Oil Imports. A month later this Special Committee reported to the President its conclusions that a quota system should be adopted with respect to the importation of crude oil and recommended specific quotas for individual oil importers, including plaintiff. That same day, July 29, 1957, the President approved the recommendations of the Special Committee and directed that they be put into effect immediately.

The circumstances leading to the quota imposed upon the plaintiff date back to March 20, 1957 when the Office of Defense Mobilization requested of the plaintiff (and all other oil importers) forecasts of its oil imports for the last half of that year. Plaintiff replied that it expected to import 10,000 barrels per day in July and August and 22,500 barrels per day for the remainder of the year. These figures were based upon two oil import contracts which plaintiff had with Mid-Eastern suppliers: the first, an agreement to purchase 22,500 barrels per day of Kuwait oil;[2] the second, to buy 4,500 barrels per day of Wafra oil.[3] The oil bought under the second contract, however, was not refined in this country but was unloaded at Houston, Texas, and immediately reshipped to a Japanese purchaser. For this reason plaintiff did not include Wafra oil in its estimate.

On July 1, 1957, the Office of Defense Mobilization asked plaintiff to confirm the estimates originally submitted in March. The following day, by telegram, over the name of the Senior Vice-President of plaintiff corporation, the figures provided on March 20 were stated to be still accurate.

Based upon these estimates, plaintiff's quota was adjudged to be 18,300 barrels per day. The day following the President's directive, on July 30, hours after the receipt by plaintiff of its quota allotment under the program, plaintiff wired the Office of Defense Mobilization that its telegram of July 2 was, by inadvertence, incorrect. Plaintiff asked for a revision of its quota to include the 4,500 barrels per day of Wafra oil which was, through clerical error, omitted in its July 2 response. The contract with their

1. Section 7 of the Trade Agreements Extension Act of 1955, 69 Stat. 166, 19 U.S.C.A. § 1352a provides:
   "In order to further the policy and purpose of this section, whenever the Director of the Office of Defense Mobilization has reason to believe that any article is being imported into the United States in such quantities as to threaten to impair the national security, he shall so advise the President, and if the President agrees that there is reason for such belief, the President shall cause an immediate investigation to be made to determine the facts. If, on the basis of such investigation, and the report to him of the findings and recommendations made in connection therewith, the President finds that the article is being imported into the United States in such quantities as to threaten to impair the national security, he shall take such action as he deems necessary to adjust the imports of such article to a level that will not threaten to impair the national security."

2. Oil from the Kuwait oil field supplied by the British Petroleum Company.

3. Oil from the Wafra oil field supplied by the American Independent Oil Company.

Japanese buyer had expired June 30 and could not be renegotiated.[4]

On September 17, 1957, plaintiff was given a hearing before defendant Carson, Administrator of the Voluntary Oil Import Program, on the issue of revision of its quota. Defendant Carson refused plaintiff's request, saying in part: "An exercise of my limited authority to alleviate inequities would, I believe, be justified only in the event of a showing by the petitioner that it has made vigorous efforts to find a foreign market for the crude or to be relieved of its contractual obligation."

Plaintiff alleges, through affidavits, that it then contacted its foreign supplier under the Wafra contract and asked to be relieved of its obligation and was refused. Plaintiff attempted to find another foreign purchaser but here, too, it was unsuccessful.[5]

Plaintiff sought a rehearing of its case but this was denied. It continued throughout the latter half of 1957 and the first quarter of 1958 to contact Administrator Carson and other officials in the program seeking an adjustment of this matter.

Then, on March 27, 1958, the President attached sanctions to non-compliance by Executive Order 10761, 23 Fed.Reg. 2067, U.S.Code Congressional and Administrative News 1958, p. 587. Under this order, the heads of all executive departments were directed to apply the provisions of the Buy American Act of 1933[6] to non-complying imported crude oil. The purchase of petroleum or petroleum products containing non-complying crude oil by the various executive departments and agencies of the Government was prohibited. This order was made effective thirty days from its issuance.

On May 15, 1958, plaintiff appeared before Roland A. Whealy, Acting Administrator in Carson's absence, and A. Bruce Wright, the Administrator's counsel, and again presented its case for relief. Again relief was denied and plaintiff appealed to Acting Secretary of the Interior Chilson who affirmed the Administrator's decision on June 18, 1958.

During this period, plaintiff imported oil at the following rate:[7]

| 1957 | Barrels per day |
|---|---|
| July | 12,400 |
| August | 24,000 |
| September | 25,900 |
| October | 35,000 |
| November | 27,000 |
| December | 24,700 |
| 1958 | |
| January | 25,800 |
| February | 17,800 |
| March | 28,700 |
| April | 32,600 |
| May | 27,300 |
| June | 27,000 |
| July | 27,000 |
| August | 27,000 |

4. Affidavit of James R. Connor, plaintiff's attorney, filed with this Court June 24, 1958.

5. Plaintiff alleges in its complaint (paragraph 29) that it also at this time (apparently at least before April 1—see par. 32) obtained an opinion from counsel that it could not be relieved of its obligation to accept Wafra oil under the "force majeure" provisions of its contract. In fact, this opinion was not rendered until April 11, 1958 (see Exhibit "2" attached to plaintiff's supplemental reply to defendant's opposition to motion for preliminary injunction) *after* Executive Order 10761 of March 27, 1958, giving teeth to the program, had been issued. The effective date of this Executive Order was April 26.

6. 47 Stat. 1520, as amended, 41 U.S.C.A. Sec. 10a–10d.

7. These figures were supplied by defendant Carson in an affidavit filed with this Court August 7, 1958. The figures for 1957 are based upon reports submitted to his office during this period. Subsequent to that period—plaintiff no longer submitted reports—they are based on figures supplied by plaintiff to the Texas Railroad Commission of actual imports for the first three months of 1958, and estimated imports for the remaining months. The figures for July, 1957—March, 1958, are "assumed to be correct". (Affidavit of Duncan Neblett, Senior Vice-President of plaintiff corporation, filed with this Court August 8, 1958.)

Commencing April 26, 1958, plaintiff attempted to comply with the decreed quotas [8] by importing at its contractual commitments and placing all oil above the quota limit in bonded storage in accordance with rules which had been promulgated by the Administrator. This was done until the latter part of July when, having utilized all available storage facilities, plaintiff was no longer able to import at its desired amount and still comply. Since that time plaintiff has been in non-compliance with the program.[9]

As a result of this non-compliance, plaintiff alleges it is threatened with irreparable injury: the loss of two large contracts under which it has been and will continue to sell oil to the Government; the loss of future Government contracts; and ramifications of Executive Order 10761 which may affect its sales to private oil purchasers in the United States.

On June 21, 1958, plaintiff filed its complaint alleging irregularities in the administrative procedure relative to publication and a fair hearing; lack of proper procedure in the imposition of the Voluntary Import Quota Program, since the President did not specifically make a finding of a threat to national security; improper delegation of legislative power to the executive; the imposition of sanctions via the Buy American Act contrary to that statute; and the arbitrary fixing of its quota by the Administrator.

Plaintiff's suit for injunction, however, filed at the same time, and presently before this Court, seeks only to prevent the carrying out by Government officials of the sanctions imposed by Executive Order 10761.

This motion was first heard before another judge of this court who denied the injunction and dismissed the complaint for failing to state a cause of action, 163 F.Supp. 797.

The Court of Appeals for the District of Columbia reversed, stating, "Because appellant tendered the issue of arbitrary action by appellees in implementing the Voluntary Oil Import Program by sufficient allegation in its complaint, the complaint states a claim upon which relief could be granted and should not have been dismissed.

"It is therefore ordered by the court that this case be * * * remanded to the District Court * * * to afford appellees an opportunity, in opposition to the motion for preliminary injunction, to controvert the allegations of arbitrary action; then to promptly hold a hearing for the purpose of determining whether a preliminary injunction, pending trial, is warranted."

8. Par. 37 of plaintiff's complaint. No statement appears explaining what was done with non-complying oil before sanctions were imposed. Presumably, until April 26, 1958, despite "vigorous attempts to comply", plaintiff imported and used to its own purposes oil imported above its allotted quota.

It should be also noted that although plaintiff's clerical error theory would raise its total 4,500 barrels per day to 22,800 barrels per day, it is claiming as its proper quota 27,000 barrels per day in 1958. Plaintiff arrives at this figure on the basis of its normal imports, the figures of the Administrator having been compiled during the Suez crisis when Mid-Eastern oil was difficult to obtain. This adjustment would also affect a substantial number of other firms in the industry. Despite the fact that no such adjustment has been made by the Administrator and that it cannot be justified on the basis of a clerical error, plaintiff has unilaterally decided it is entitled to 27,000 barrels of oil a day in 1958 and has continued to import at that rate. The figures above even this quota (sometimes as high as 32,600 and 35,000) are explained as due to the "vagaries of tanker movements." p. 10 of plaintiff's "Supplemental Reply to Defendants' Opposition to Motion for Perliminary Injunction".

9. Page 20 of plaintiff's "Supplemental Reply to Defendant's Opposition to Motion for Preliminary Injunction."

**368**

In deciding, therefore, whether to grant the injunction prayed for, the Court has examined the arbitrariness of the Administrator's action in accordance with the Court of Appeals' mandate to determine whether "there is enough to substantiate plaintiff's claims so as to move the court in the exercise of a sound discretion to intervene by its process" [10] pending trial of main action.

The Court has concluded, for the reasons stated below, that the injunction should not be granted.

Plaintiff's contention of arbitrary action on the part of the Administrator rests on the validity of two propositions: (a) that plaintiff's telegram of July 2, 1958, was the result of a clerical error, and (b) the contract for Wafra oil was a planned import until 1959 which could not be avoided without serious monetary loss.

To substantiate the clerical error theory, plaintiff has submitted the affidavit of Duncan Neblett, Senior Vice-President of the firm, above whose signature the telegram was sent. His affidavit recites merely the conclusion, "Through clerical error, plaintiff's estimated importation of 4,500 barrels per day * * * was omitted." There has also been submitted to the Court a copy of a letter written by Richard Kahle, president of Eastern States Refining and Chemical Corporation, written on September 16, 1957 and addressed to Administrator Carson, which explains the origin of the error in somewhat more detail.

According to this letter, plaintiff, when it submitted its original estimates of imports in March, mentioned to the Office of Defense Mobilization its two contracts and stated further that the Wafra oil was presently being diverted to Japan and need not, therefore, be considered in the prospective imports of the plaintiff. "However, *several weeks* later, it

was learned that it was impossible to obtain a renewal of the Japanese contract" [11] and, therefore, the Wafra crude would, after June 30, 1957, have to be imported into the United States. "It was this later development that was unknown to and overlooked by our representative when he advised ODM by telegram on July 2, 1957 that our earlier forecast of March 20, 1957 was unchanged."

James O'Connor, attorney for the plaintiff at the hearings before the Administrator, attests further in his affidavit that this failure to renew the Japanese contract was transmitted orally to the Office of Defense Mobilization on June 13, 1957 at a meeting attended by Kahle, O'Connor, Gordon Gray, Director of ODM, and Charles Kendall, ODM's general counsel.

On the basis of this information, Administrator Carson appears to have concluded that the figures were an exercise of business judgment on the part of plaintiff and plaintiff was seeking an adjustment to allow for private contractual difficulties which had arisen. It is not for this Court to decide this question one way or the other; it is enough to find, as the Court does, that there was ample evidence to sustain the administrator's determination.

The error was substantial, involving a sum of nearly $15,000 per day. The contract with the Japanese purchaser was not suddenly breached or terminated, but expired after running its normal course on June 30, 1957. Difficulties concerning its renewal were known as early as April or May, 1957, and communicated to ODM in June. In the light of this it is inconceivable that all executive personnel were not aware of the true situation. The error, although made on July 2, was not corrected until July 30, and no explanation has been presented how any responsible official permitted

10. Pang-Tsu Mow v. Republic of China, 1952, 91 U.S.App.D.C. 324, 201 F.2d 195, 199, certiorari denied 1953, 345 U.S. 925, 73 S.Ct. 784, 97 L.Ed. 1356.

11. Emphasis supplied.

the telegram to be sent in the first instance. It has been suggested to the Court in oral argument that plaintiff, on numerous occasions, had to supply figures relating to its activities to the Government and, therefore, attached no particular significance to the request here. It would appear to the Court the height of casualness to suggest that so little interest was evinced in a telegram sent to the Office of Defense Mobilization as to fail to notice the omission of a figure amounting to $15,000 a day. Rather, it appears reasonable to the Court to assume, as the Administrator did, that the true picture was that plaintiff was attempting to find another foreign purchaser for its Wafra crude in hopes of gaining greater profits, or for some other reason, and when this failed, wished to import this oil into the United States. In the light of this situation, the Administrator could consider the equities presented by the plaintiff versus the necessity of keeping to the formula and quotas set for the Voluntary Oil Import Program.[12]

■ In balancing the relative hardship to the individual importer versus need of maintaining plaintiff's quota in order to insure the success of the program, it was proper for the Administrator to consider the difficulty of plaintiff to conform to the decreed quotas.

Plaintiff has contended that it explored every possibility open to it and found no way to avoid the necessity of fulfilling its commitment to purchase 4,500 barrels of Wafra a day. It has made efforts to find another foreign purchaser for its oil and has asked its supplier to be voluntarily relieved of its obligation, with no success. For the first time, plaintiff has submitted to the Court a copy of its contract with its supplier and a letter dated April 11, 1958, from its Houston counsel, advising them that the escape clause could not be used in this instance. A copy of this contract was also submitted in confidence to Administrator Carson at the first hearing on plaintiff's request for a quota revision.

The Court is of the opinion that Article 5, force majeure, of the contract applies to the situation here and relieves plaintiff of its problem.

■ Clause 5 of the contract headed "Force Majeure" reads as follows:

"Seller shall not be liable for loss, damage, claims or demands of any nature whatsoever or be deemed to have breached any undertaking hereunder because of any delays or failures or omissions to deliver crude oil to Purchaser if it be shown the default has arisen or that Seller has been prevented *or hindered* in the observance or performance of any of the terms and conditions of this Agreement by any circumstances beyond its control including, *but not restricted to*, * * * illegality or *any restriction* or prohibition of imports of crude oil arising from applicable domestic or foreign laws or regulations, blockade, labor disturbances, riots, insurrections, or civil commotions, quarantine restrictions, epidemics, storms, earthquakes, accidents, breakdown or injury to or expropriation, confiscation, nationalization or requisition of Seller's crude production or gathering, delivery and/or terminal facilities, abnormal decline or exhaustion of Seller's crude oil production, sanding of wells, or partial or total interruption or loss of transportation facilities. * * * Insofar as any of the above causes shall prevent Purchaser's acceptance of any deliveries of crude oil to be made by Seller hereunder, Purchaser shall be relieved of accepting and paying for any such delivery or deliveries." (Emphasis supplied.)

Counsel for plaintiff interpreted these clauses as follows: "From an analysis

---

12. In this regard see the letter of the Gulf Oil Corporation threatening to import above its allotted quota if there were revision of plaintiff's quota by Administrator Carson.

of these provisions we have concluded that the purchaser must be prevented from accepting deliveries of crude oil by reason of one or more of the enumerated causes and that difficulties encountered by the purchaser in the marketing of the products refined from the crude purchased are not embraced within the enumerated causes."

The Court cannot agree with this interpretation. Clause 5 specifically says, "including, but not restricted to" and then, in listing the problems which may be encountered, says, "any restriction * * * of imports * * * arising from applicable domestic or foreign laws." It seems clear to the Court that this language was intended to be all-inclusive, to specifically extend beyond the enumerated possibilities and to embrace other acts not foreseen but outside the control of the contracting parties.

The Court is of the opinion that the operation of this clause would relieve plaintiff of any hardship, beyond the loss of the profits of its purchases. Unfortunately, during the year that the problem has been before it, plaintiff has not seen fit to make use of the arbitration procedure available under the contract to determine this question.

For the above reasons, and after a careful review of the record in this case, the Court concludes that the plaintiff has not made a substantial showing of arbitrariness in the Administrator's action so as to warrant the granting of a preliminary injunction.

Although the Court is of the opinion that according to the Court of Appeals' decision only the issue of arbitrariness was reinstated in the case, it has, for the purpose of this motion, assumed that the other issues alleged in the complaint are still alive. It has, therefore, also examined the substantiality of these contentions and does not feel that there is a strong enough showing at this juncture to warrant the granting of this extraordinary relief.

The Government has raised other objections to the granting of a preliminary injunction in this case, questioning plaintiff's standing to sue, the right to limit the purchasing power of the Government, etc. Because of the Court's disposition of the case, it is not necessary to examine these contentions in detail. It does appear to the Court that the opinion of the Supreme Court in Perkins v. Lukens Steel Co. would preclude an injunction of the type sought here. Although plaintiff has sought to distinguish that case, the language in the opinion is sweeping and clear: "Like private individuals and businesses, the Government enjoys the unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases."[13]

The motion for a preliminary injunction is denied.

This memorandum may be considered as specific findings of fact and conclusions of law.

Counsel will present the appropriate order.

13.   1939, 310 U.S. 113, 127, 60 S.Ct. 869, 876, 84 L.Ed. 1108.