**SKELLY OIL COMPANY, Plaintiff,**

v.

**Stewart UDALL et al., Defendants.**

**Civ. A. No. 297–68.**

United States District Court
District of Columbia.

July 31, 1968.

Daniel M. Gribbon, and Robert N. Sayler, Washington, D. C., for plaintiff.

William Gershuny, Dept. of Justice, and Robert Long, Assoc. Sol., Dept. of Interior, for defendants.

## OPINION

PRATT, District Judge.

The case raises the question of Plaintiff's eligibility for an allocation of foreign crude oil under the Mandatory Oil Import Program established in 1959 by Presidential Proclamation 3279. Plaintiff Skelly Oil Company in 1967 was determined by the Administrator, Oil Import Administration, charged by the Secretary of the Interior with the administration of the Program, to be ineligible for an allocation of foreign crude oil on the single ground that Plaintiff was under the "control" of Getty Oil Company, hereinafter sometimes referred to as "Getty." Plaintiff, in asking for a declaratory judgment and in-

junctive relief, seeks to set aside the action of the Administrator on several grounds:

1. The failure to grant Plaintiff the authority to participate in the importation of foreign crude oil was invalid because of the Administrator's failure, prior to this action, to grant Plaintiff the hearing as required by the Administrative Procedure Act and Section 20 of the Oil Import Regulation 1;

2. The Administrator, in his interpretation of Section 4(g) of Regulation 1, was in error when he used stock voting power, rather than economic ownership or independent management as the determining criterion;

3. If Oil Import Regulation 1 was properly construed by the Administrator and operated to deny Plaintiff's eligibility, the Secretary of the Interior in promulgating said Regulation exceeded the authority delegated to him in Proclamation 3279 and acted contrary to law; and

4. The failure and refusal of the Oil Import Appeals Board to recognize the special circumstances and exceptional hardship, created by the determination of Plaintiff's ineligibility, was arbitrary and capricious and should be set aside.

Defendants,* by answer, have questioned the jurisdiction of the Court to consider the subject matter and, while admitting the essential facts, have denied the legal conclusions set forth in the Complaint.

The Court, after considering the evidence, both oral and written, presented by the parties, and after hearing argument thereon, in accordance with Rule 52 of the Federal Rules of Civil Procedure, makes the following:

## FINDINGS OF FACT

1. The Mandatory Oil Import Program was established pursuant to Presidential Proclamation 3279, promulgated March 10, 1959. The Proclamation re-sulted from a determination by the President that mandatory limitations should be imposed on the importation, inter alia, of foreign crude oil by domestic refiners in order "that such imports would not threaten to impair the national security." Basic considerations included encouragement of domestic exploration and development and protection of independent inland refiners threatened by the competitive advantage of integrated companies having access to lower cost foreign crude. The Proclamation provided for a maximum level of imports through a system of allocations and licenses and authorized the Secretary of the Interior to issue regulations implementing the Proclamation and providing for "a fair and equitable distribution among persons having refinery capacity * * * in relation to refinery imports." As a transition from the earlier voluntary program to the Mandatory Program, the Proclamation permitted allocations to be based on the higher of either a declining percentage of the importer's last quota under the voluntary program (the "historical basis") or on the size of current refinery operations (the "import basis").

2. Pursuant to the authority contained in the Proclamation, the Secretary of the Interior issued Oil Import Regulation 1, which established the Oil Import Administration under the direction of an Administrator to carry out the Mandatory Oil Import Program.

3. Section 4(g) of Regulation 1, dealing with the matter of eligibility for allocations, provides:

"(g) A person is not eligible individually for an allocation of imports of crude oil and unfinished oils or finished products if the person is a subsidiary or affiliate owned or controlled, by reason of stock ownership or otherwise, by any other individual, corporation, firm, or other business organization or legal entity. The con-

* Stewart Udall, Secretary of the Interior, Elmer L. Hoehn, Administrator, Oil Import Administration, and Glen D. John-son, Stanley Nehmer and Paul H. Riley, members of the Oil Import Appeals Board.

trolling person and the subsidiary or affiliate owned or controlled will be regarded as one. Allocations will be made to the controlling person on behalf of itself and its subsidiary or affiliate but, upon request, licenses will be issued to the subsidiary or affiliate."

The conceded purpose of Section 4(g) was to protect the integrity of Section 10(b) of Regulation 1, which established a "sliding scale" of allocations, depending on total volume of refinery inputs, as a result of which smaller refiners are authorized to import a larger percentage of their inputs than are larger refiners. Section 4(g) was designed to prevent corporations, which controlled other companies having refinery operations from having such companies treated separately for allocation purposes, or from splitting up certain of their operations into separate corporate entities, as a result of which the controlling parent corporations in either case would be permitted multiple use of the "sliding scale" thereby enjoying larger allocations of foreign crude oil than was intended.

4. Section 20 of Regulation 1 authorizes the Administrator, after hearing, to revoke or suspend any allocation or license issued under the Regulations. Oil Regulation 2, published November 18, 1967, and after this controversy originated, sets forth in detail the "Rules for Proceedings for the Suspension or Revocation of Allocations and Licenses."

5. Section 21 of Regulation 1 establishes within the Department of the Interior an Oil Import Appeals Board with power to consider petitions by persons affected by the Regulation, to modify any allocation on the grounds of exceptional hardship or error, to grant allocations in special circumstances, and to review the revocation or suspension of any allocation or license.

6. Plaintiff Skelly Oil Company, a Delaware corporation with principal place of business in Tulsa, Oklahoma, is a producer, refiner, and marketer of petroleum products. It produces crude oil and natural gas principally in the Alaska, Rocky Mountain, Mid-Continent and Gulf Coast areas of the United States and in Canada. Its refinery is located at El Dorado, Kansas, and has a capacity of 68,500 barrels per day. It sells gasoline and other refined petroleum products, through jobbers and through its own bulk stations to retail dealers, and through its own retail service stations. Such products are distributed principally in the Mid-Continent area of the United States. At all relevant times since 1959, Plaintiff has been a publicly-owned company, the stock of which has been regularly listed and traded on the New York Stock Exchange. As of December 31, 1966, it had approximately 5,000 stockholders of record. A majority of its stock (71%) is owned by Mission Corporation, a publicly-owned holding company. A majority of Mission Corporation's stock (69%) is owned, in turn, by the Getty Oil Company.

7. Getty Oil Company, also a Delaware corporation, with principal offices at Wilmington, Delaware, and Riyadh, Saudi-Arabia, is, in general, engaged in the business of exploring, acquiring interests in and developing prospective oil and gas lands, gathering and sale of crude oil and the production and sale of natural gas. Other than the properties of Tidewater Oil Company, merged with Getty in 1967, Getty does not own or operate any refineries or natural gasoline plants (except for a partial interest in one such plant), or any marketing facilities. Tidewater, prior to its merger with Getty, owned crude oil and natural gas reserves in the California, Gulf, and Mid-Continent areas of the United States and in Canada, and a crude oil refinery located south of Wilmington, Delaware, with a capacity of 98,000 barrels per day. Tidewater marketed its products largely in the eastern portion of the United States. From 1959 to the end of 1966, Getty owned eighty-two (82) percent of Mission Development Company, which in turn owned forty-seven (47) percent of the stock of Tidewater. In

addition, Getty owned twenty-two (22) percent of Tidewater with the result that by virtue of its own holdings and its ownership of Mission Development Company, Getty owned and voted a majority of the stock of Tidewater. As a result of the merger of Getty, Tidewater and Mission Development Company in 1967, Getty, the surviving company, now owns and operates the domestic refining capacity previously owned by Tidewater. There is not now and at no time has there ever been, any stock relationship between Plaintiff Skelly and Tidewater.

8. By letter dated June 3, 1959, from George F. Getty II, President of Tidewater, to Captain M. V. Carson, Jr., the then Administrator, the latter was advised of Getty's stock holdings in Mission Development Company (58.55%), in Mission Corporation (47.10%), and in Tidewater (14.31%), of Mission Development Company's ownership of voting stock in Tidewater (42.62%) and of Mission Corporation's ownership of voting stock in Plaintiff Skelly (59.38%). Tidewater, beginning in 1959 and up to the time of its merger with Getty in 1967, received allocations on the "historical basis" as provided in Section 10(c) of Regulation 1.

9. On eight separate occasions between March, 1959, when the Mandatory Oil Import Program took effect, and December, 1966, Plaintiff Skelly was granted by the Administrator an allocation of foreign crude oil based on its refining imports through application of the graduated scale provided by Section 10(b) of Regulation 1.

10. By letter dated December 13, 1966 to the Oil Import Administration, Plaintiff Skelly submitted its revised application for an allocation and license for the importation of crude and unfinished oils for the period January 1–December 31, 1967. By letter dated December 23, 1966 from Elmer L. Hoehn, Administrator, Plaintiff Skelly was advised that a question had arisen as to the application of Section 4(b) of Oil Import Regulation 1 with respect to Skelly Oil and Tidewater, "that, in fairness to Tidewater and Skelly, the matter should be further explored before reaching a final decision," and that "Under the circumstances we are issuing crude and unfinished oil licenses authorizing importation of 1,082,199 barrels." The license covering such importation was issued to Plaintiff on December 27, 1966 for the period beginning January 1, 1967 and ending December 31, 1967, "unless revoked prior thereto." The Oil Administrator's Release of December 29, 1966 pertaining to the 1967 import allocations listed Plaintiff Skelly as authorized to import 5,979 barrels per day. This daily authorization works out to 1,082,199 barrels over a 181-day period (approximately 6 months).

11. By letter dated June 30, 1967 from Elmer L. Hoehn, Administrator, J. Paul Getty, President of Getty Oil Company, was advised that Getty Oil, Tidewater and Skelly "will be regarded as one and Getty will be the only eligible applicant for allocations based upon the operations of Tidewater and Skelly." Enclosed with this letter was a copy of an eight-page legal memorandum dated May 11, 1967 from the Associate Solicitor, Mineral Resources and General Legal Services, addressed to the Administrator, Oil Import Administration. Said memorandum purported to set forth the history and purpose of Section 4(g), and, except for the previous treatment of the Skelly and Tidewater cases, the consistent administrative interpretation placed upon said Section 4(g) and its predecessors.

12. The Administrator's determination of Plaintiff's ineligibility was based solely on Section 4(g), as interpreted in the memorandum to him of May 11, 1967 of the Associate Solicitor.

13. Plaintiff was not accorded a formal hearing prior to the Administrator's action of June 30, 1967, although several informal hearings and conferences were held with respect to this matter.

14. On July 28, 1967, Plaintiff, pursuant to the provisions of Section 21 petitioned the Oil Import Appeals Board for a hearing and for reversal of the

Administrator's decision of June 30, 1967. A hearing was held by the Appeals Board on August 22, 1967. On December 19, 1967, the Appeals Board with one of its three members dissenting, denied Plaintiff's petition and left standing the decision of the Administrator.

15. During 1967, Plaintiff was unable to import some 461,464 barrels of the 1,082,199 barrels of crude and unfinished oils which it was licensed on December 27, 1966 to import during the said year. This amount was not imported during 1967 because of the general disruption in oil imports caused by the crisis in the Middle East. On January 12, 1968, Plaintiff in compliance with the Administrator's notice of January 3, 1968 and with Section 23 of Oil Import Regulation 1 (Rev. 6) returned its partially used license to the Oil Import Administration pursuant to this provision of the Regulation that without further application it would have a license reissued to it for the amount of the unused portion of the returned license. On March 1, 1968, Plaintiff was informed by the Administrator that it would not be permitted to import the unimported balance of said 461,464 barrels. The Administrator's action was not preceded by a hearing. As indicated by the Administrator's Release of March 1, 1968, all other refiners, having an unimported balance for 1967, were granted permission, without further application, to import the unimported balance of their 1967 licenses during 1968 and 1969.

16. On October 27, 1967, Plaintiff applied for an allocation and license under Section 10 to import crude oil for the year 1968. No allocation or license has been issued. Getty has received an allocation for 13,140 barrels per day for the current period. On March 22, 1968, Plaintiff made application to the Administrator requesting a license for its appropriate share of the 1968 allocation given to Getty.

17. In December, 1966 and at all subsequent times pertinent hereto, Getty owned not less than 64.77% of the voting stock of Mission Corporation, which in turn owned 71.09% of the voting stock of Plaintiff. From the foregoing, it is apparent that Getty has the power to vote a substantial majority of the Plaintiff's voting stock. Five (5) of the nine (9) members of Plaintiff's Board of Directors are also members of Mission Corporation's six (6) member Board of Directors and two (2) of Plaintiff's directors until recently also served as directors of both Mission Corporation and Getty. While none of Plaintiff's officers serve as officers of Mission Corporation, four (4) of Mission's officers also serve as officers of Getty.

18. In December, 1966 and at all subsequent times pertinent hereto, Plaintiff Skelly was operated as an independent company. Getty has made no attempt, through its power to vote a majority of Plaintiff's voting stock, to control the management policy, decisions and operations of Plaintiff as a separate corporation. More specifically, Plaintiff conducts its buying, refining and marketing operations as a Skelly enterprise. Its business dealings with Getty and Tidewater are both infrequent and limited, being no more and perhaps less than those it conducts with other major oil companies.

19. The loss of its eligibility for a separate allocation for the second half of 1967 is estimated to have cost Plaintiff a sum in excess of $1,000,000. For the year 1968, further costs in excess of $3,000,000 are estimated as the result of Plaintiff's continued loss of eligibility. Both of these figures, reflected in increased refinery import costs, arise from the fact that the price differential between domestic and foreign crude oil is approximately $1.25 per barrel.

20. Getty has not made available to Plaintiff any part of its 1968 allocation of foreign crude oil. It has recently filed suit in the Chancery Court at Wilmington, Delaware, for a declaratory judgment asking that it not be required to share its allocation with Plaintiff. Said suit, which has been removed to the

United States District Court at Wilmington, is presently pending.

### CONCLUSIONS OF LAW

1. The Administrator's decision of June 30, 1967, determining that Plaintiff was not eligible for a separate allocation and license was not a revocation or suspension of Plaintiff's license. Hamlin Testing Laboratories, Inc. v. United States Atomic Energy Commission, 6 Cir., 357 F.2d 632. Plaintiff was not entitled to a hearing, prior to such action, as is provided for under Section 20 of Regulation 1 and under the Administrative Procedure Act.

2. The Administrator, in his interpretation of Section 4(g) of Regulation 1, was correct when he determined that Plaintiff, because of Getty's ability to vote a majority of Plaintiff's voting stock, was under the control of Getty and therefore not eligible for a separate allocation and license to import foreign crude oil under the Mandatory Oil Import Program.

3. Section 4(g) of Regulation 1 has a rational basis consistent with the purposes of the Mandatory Oil Import Program. Udall et al. v. Washington, Virginia and Maryland Coach Co., Inc. D.C.Cir., (slip opinion, June 12, 1968). In promulgating Regulation 1, containing said provision, the Secretary of the Interior acted in accordance with the authority delegated to him in Presidential Proclamation 3279 and according to law.

4. The Oil Import Appeals Board in its decision of December 19, 1967, did not act arbitrarily or capriciously when it failed, after hearing, to reverse and set aside the Administrator's decision of June 30, 1967.

5. The Administrator's decision of March 1, 1968 that Plaintiff would not be permitted to import the licensed but unimported balance of 461,464 barrels, which Plaintiff was prevented from importing in 1967 because of the Middle East crisis, was a *pro tanto* revocation of Plaintiff's 1967 license and invalid because it was not preceded by the hearing required under the provisions of Section 20 of Regulation 1. Irrespective of the matter of a hearing, said decision of March 1, 1968 was invalid because it was in violation of Section 23 of Oil Import Regulation 1 (Rev. 6). Under said Section 23, the determination of ineligibility for an allocation is not conclusive of one's eligibility for a license. See also Section 4(g) of Oil Import Regulation 1, which permits the issuance of a license to one otherwise ineligible for an allocation.

Counsel will submit an appropriate order.