**MURPHY OIL CORPORATION,**
Plaintiff-Appellee,

v.

**Walter J. W. HICKEL, Secretary of the Interior, Defendant-Appellant.**

No. 20202.

United States Court of Appeals,
Eighth Circuit.

March 8, 1971.

Mehaffy, Circuit Judge, dissented and filed opinion.

Donald L. Horowitz, Atty., Dept. of Justice, Washington, D. C., William D. Ruckelshaus, Asst. Atty. Gen., Bethel B. Larey, U. S. Atty., Robert V. Zener, Attys., Dept. of Justice, Washington, D. C., for defendant-appellant.

William J. Wynne, Crumpler, O'Connor, Wynne & Mays, El Dorado, Ark., for plaintiff-appellee, Murphy Oil Corp.

Before VOGEL, MEHAFFY and LAY, Circuit Judges.

VOGEL, Circuit Judge.

This is an appeal from the United States District Court for the Western

District of Arkansas. That court awarded Murphy Oil Company, appellee, a declaratory judgment correcting what it found to be an interpretative error by the Secretary of the Interior under the Mandatory Oil Import Program,[1] and a mandatory injunction requiring the Secretary to increase Murphy's crude and unfinished oil import allocation under that program.[2] The Secretary appeals. Jurisdiction of the federal courts is based upon 28 U.S.C.A. § 1331.

A brief review of the purpose and history of the Oil Import Program is essential in order to better comprehend the context in which this case arises and our disposition of the issues.[3]

Originally, the program to regulate the amount of oil imported into the United States was voluntary and was initiated to alleviate the national security problems arising because of the extensive reliance by American industry on the overseas importation of foreign oil. See Eastern States Petroleum & Chemical Corp. v. Seaton, D.D.C., 1958, 165 F. Supp. 363.

Further study indicated that the voluntary program would not satisfactorily curb the reliance on imported oil and the President ordered a Mandatory Oil Import Program. Proclamation 3279, 73 Stat. c25 (1959). Two geographical areas were established for the program, one east of the Rocky Mountains (Districts I-IV) and the other west of the Rocky Mountains (District V). Generally, persons could not import crude or unfinished oils into these areas without a license and an import allocation which would be provided upon application to the Secretary of the Interior. The Sec-

retary was instructed to issue regulations for the operation of the program which regulations were to provide, in part, for

"* * * a fair and equitable distribution among persons having refinery capacity in these districts in relation to refinery inputs during an appropriate period or periods selected by the Secretary and may provide for distribution in such manner as to avoid drastic reductions below the last allocations under the Voluntary Oil Import Program." Proclamation 3279, 73 Stat. c25, 3(b) (1) (1959).

Under the regulations a person entitled to apply for an allocation who has had either refinery capacity in the districts or recent refinery inputs, (32A CFR Chap. X § 4(a))

"* * * includes an individual, a corporation, firm, or other business organization or legal entity, and an agency of a State, territorial, or local government, but does not include a department, establishment, or agency of the United States; * * *." 32A CFR Chap. X § 22(a).

This definition is limited by the important rule of § 4(g):

"A person is not eligible individually for an allocation of imports of crude oil and unfinished oils or finished products if the person is a subsidiary or affiliate owned or controlled, by reason of stock ownership or otherwise, by any other individual, corporation, firm, or other business organization or legal entity. *The controlling person and the subsidiary or affiliate owned or controlled will be regarded as one.* Allocations will be

1. The President instituted the program by Proclamation No. 3279, as amended, which now appears as a note to 19 U.S. C.A. § 1862. The regulations promulgated thereunder are found in 32A CFR Chap. X, § 1, et seq. Neither the constitutionality nor the validity of the program and regulations is in issue here.

2. The District Court's opinion is reported: Murphy Oil Corp. v. Hickel, W.D.Ark., 1969, 307 F.Supp. 812.

3. Similar reviews of only the earlier history of the program can be found in Atlantic Refining Co. v. Standard Oil Co., 1962, 113 U.S.App.D.C. 20, 304 F.2d 387; Texas American Asphalt Corp. v. Walker, S.D.Tex., 1959, 177 F.Supp. 315. A more recent discussion is in Pancoastal Petroleum, Limited v. Udall, 1965, 121 U.S.App.D.C. 193, 348 F.2d 805.

made to the controlling person on behalf of itself and its subsidiary or affiliate but, upon request, licenses will be issued to the subsidiary or affiliate." (Emphasis supplied.) 32A CFR Chap. X § 4(g).

The regulations provided that the import allocation would be the larger of 1) a percentage of certain of the applicant's previous inputs which percentage was to be computed on a scale which decreased the allocation as input volume increased (input basis) or 2) a fixed percentage of the last allocation under the Voluntary Import Program (historical basis). 32A CFR Chap. X § 10.

A subsequent proclamation, Proclamation 3290, 73 Stat. c39 (1959), amended Proclamation 3279 to allow the unrestricted import of oil from Canada by overland means, [4] and also to exclude the Canadian oil from the computation of the input basis. The practice continued of including Canadian crude oil in the computation of the historical basis. Thus, a company with a high Canadian input would generally have a higher import quota on the historical basis than it would have on the input basis.

Proclamation 3279 was amended again to provide for a gradual reduction of allocations made on the historical basis and for a more rapid reduction of the historical basis allocations which reflect imports of Canadian crude. Proclamation 3509, 77 Stat. 963 (1962). Shortly after the Middle East crisis of June 1967, another amendment provided that historical allocations reflecting imports

of Canadian crude oil should not be reduced beyond the point which

" * * * would result in a reduced historical allocation which is smaller than an allocation for the same period would be if computed (for the purposes of comparison only) on the basis of a total of refinery inputs (of the holder of the historical allocation) which includes inputs of crude oil and unfinished oils imported * * * [by overland means from Canada]." Proclamation 3823 subd. 2(b) (1), 82 Stat. 1603, 1604 (1968).

This provision places a floor under and prevents a drastic reduction of the historical allocations of those "Northern Tier" refineries which are refineries located in the northern states (Michigan, Minnesota, Wisconsin) and peculiarly dependent on the import of Canadian oil.[5]

Basically then the program requires application by a qualified § 4(g) person for an import quota. Upon issuance of a license the company receives the larger of (a) the sliding scale percentage of its input basis or (b) the fixed (but gradually decreasing) percentage of the historical basis which is supported to some extent by a minimum floor provision for the Northern Tier importers.

Murphy Oil Company owns refineries at Superior, Wisconsin (Superior) and at Meraux, Louisiana (Meraux). Both were purchased by Murphy with recognized histories under the voluntary program and Superior is one of the Northern Tier refineries.[6] Operating statis-

---

4. Recently the President has further amended Proclamation 3279 to allow for the importation of oil from Canada by any means other than over the oceans. Proclamation 4018, 35 Fed.Reg. 16357 (Oct. 20, 1970).

5. This amendment was announced in a Department of the Interior News Release on January 29, 1968, which, in pertinent part, stated:

"Present requirements that 'historical' allocations (those made on the basis of allocations last held under the Voluntary Oil Import Program) be reduced with a more rapid reduction of

histories based upon imports of Canadian oil have been modified to the extent that histories based upon importation of Canadian oil need not be further reduced when these historical allocations would be less than an allocation made on the basis of inputs, including overland exempt oil. This revision will avoid dislocations as to the refiners and domestic producers involved. This has minimal impact for the 1968 allocation year."

6. The last allocation for Superior under the Voluntary Oil Import Program was 4,300 B/D and for Meraux, 3,500 B/D.

tics from the Superior and Meraux refineries traditionally were combined to determine Murphy's proper quota. From the adoption of the mandatory program through 1967 Murphy received eleven allocations based on the historical calculation. For the allocation period 1967 Murphy's inputs became the basis for its allocations.

With respect to the allocation awarded to Murphy for 1968 which again had been determined on the appropriate percentage of inputs, Murphy filed an appeal with the Oil Import Appeals Board on the grounds that an interpretative error had been made in determining its allocation under the recently revised version of Proclamation 3279.[7] Its basic contention there and throughout the ensuing proceedings was that since the minimum floor proviso was designed to benefit Northern Tier producers, and since only one of Murphy's refineries was in the Northern Tier, its historical allocation must be computed separately or otherwise Murphy will lose the benefit of the floor. Murphy contended that its allocation should be increased from 4,174 B/D to 5,482 B/D on the grounds that the allocation for the Superior refinery should have been calculated separately on the basis of 37.75 percent (the minimum floor) of the refinery's last allocation of 4300 B/D under the Voluntary Oil Import Program.

On December 11, 1968, the Oil Import Appeals Board which may modify any allocation made to any person on the grounds of "exceptional hardship or error", 32A CFR Chap. X § 21 (b) (1), denied Murphy's petition. In pertinent part, it ruled that:

"The Board views these circumstances as significant. Although the Regulations apparently contain no explicit prohibition against dual basis (historical and input) calculation of a refiner's allocation, it is certain that such procedure has never been followed and would be contrary to the in-

tent of the Regulations. The rule set forth in Section 4(g) is, in essence, that one eligible applicant (refiner in this case) gets one allocation in any (one) administrative area (e.g., Districts I-IV). The rule forbids allocations to subsidiaries, or affiliates owned or controlled by the 'controlling person.' In effect, petitioner is seeking two allocations, computed separately and dissimilarly, for its two refineries. The fact that the two allocations could be added together and issued as a single quantity to the controlling person, Murphy, would not alter the substance of the case. Section 4(g) is not only necessary to preserve the integrity of the sliding scale, but it is grounded in the practical consideration that many multi-facility companies use the allocation earned by one plant for the benefit of another.

"Amendment 6, in pertinent part, was adopted to put a floor under Northern Tier historical allocations. Neither the language nor the intent of this amendment (or its authorizing Proclamation) is relevant to the question of dual computation of allocations. Also the Board perceives no indication that the effect of this amendment has been to impose exceptional hardship on the petitioner.

"It is the opinion of the Board that petitioner has failed to demonstrate exceptional hardship attributable to the Program and also failed to show error on the part of the Administrator in his determination of petitioner's 1968 allocation." Decision on the Petition of Murphy Oil Corporation, Oil Import Appeals Board, Docket Q–42, December 11, 1968.

Upon Murphy's application for relief and after hearing, the District Court granted Murphy its prayer, concluding that:

"* * * declaratory judgment should be entered for purposes of correcting [the] * * * interpretive

---

7. For the first 182 days of the allocation period comprising calendar year 1968 Murphy's allocation was 4,182 B/D.

[sic] error and a mandatory injunction issued requiring the Secretary of the Interior to increase the crude and unfinished oil import allocations granted to Murphy Oil Corporation * * *."

The District Court also made as a finding of fact:

"That the application of the aforementioned provisions of Proclamation 3823 and the regulations implemental thereto only to those Northern Tier refiners whose allocations are presently computed on a 'historical' basis would be arbitrary, confiscatory and discriminatory and contrary to the statement of intent that such regulatory provision was intended to prevent dislocation of required feedstocks, and deny to Murphy equal protection under the laws in violation of the Fifth Amendment to the Constitution of the United States." Murphy Oil Corporation v. Hickel, W.D.Ark., 1969, 307 F.Supp. 812, 818–819.

In an oral bench ruling the District Court elaborated on its findings. It found no exception to the provision which allowed the use of the Northern Tier floor and it emphasized that the language of the regulations requires the use of the floor wherever a Northern Tier refiner is involved. Furthermore, the District Court ruled that there were no subsidiaries or affiliates involved in the case and, thus, Section 4(g) does not prevent the separate computation of the allocation. Murphy was to be allowed to invoke the literal language of the regulations despite any possible harm which that construction might cause to the sliding scale policy or provision of those regulations. Also, it held that since there was no one else at this time who would be in a position to ask for and obtain similar consideration the effect, if any, on the program would be minimal. All in all, it concluded that there was no "rational basis for the action taken in this matter."

We reverse the District Court's decision and remand the action to that court to enter judgment for appellant, the Secretary of the Interior.

■ Judicial review of the Administrator's interpretations of and actions under the Proclamations and regulations is necessarily limited. The "construction of a statute or regulation by those charged with administration is not to be overruled except for weighty reasons." Doe v. Department of Transportation, Federal Aviation Administration, 8 Cir., 1969, 412 F.2d 674, 678. The administrative interpretation of Proclamation 3279 and the regulations issued thereunder

"* * * is supported by the general presumption of validity and in particular by the fact that the regulation is being interpreted and applied by a board which is an affiliate of, if not identical with, the officer who fashioned the wording." Pancoastal Petroleum, Limited v. Udall, D.C.Cir., 1965, 348 F.2d 805, 807.

The standard of judicial review set out in Udall v. Tallman, 1965, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616, "applies with full vitality to the application of oil import regulations." Gulf Oil Corporation v. Hickel, D.C.Cir., 1970, 435 F.2d 440, 445. That standard, as stated by the Supreme Court of the United States, is:

"When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. * * * 'Particularly is this respect due when the administrative practice at stake "involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new."' Power Reactor Co. v. Electricians, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed. 2d 924. When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order." Udall v. Tall-

man, supra, 380 U.S. at p. 16, 85 S.Ct. at p. 801.

If the interpretation is reasonable the courts must respect it, Udall v. Tallman, supra, 380 U.S. at p. 4, 85 S.Ct. 792; accord, Red Lion Broadcasting Co. v. F.C.C., 1969, 395 U.S. 367, 381, 89 S. Ct. 1794, 23 L.Ed.2d 371; Thorpe v. Housing Authority, 1969, 393 U.S. 268, 276, 89 S.Ct. 518, 21 L.Ed.2d 474; especially if "such construction enhances the general purposes and policies underlying the legislation." Zuber v. Allen, 1969, 396 U.S. 168, 192, 90 S.Ct. 314, 24 L.Ed.2d 345.

Of course, the courts may not avoid their responsibility to insure reasonableness in administrative action and this court has acted to correct agency unreasonableness. See Pike v. CAB, 8 Cir., 1962, 303 F.2d 353. However, in this case, for the reasons discussed below, we determine that the Oil Import Appeals Board's ruling was reasonable and consonant with the policy and purposes of the Mandatory Program and accordingly may not be set aside by the courts.

 The language of § 4(g), supra, provides that allocations will not be granted to "a subsidiary or affiliate owned or controlled, by reason of stock ownership or otherwise, by any other * * * business organization or legal entity."[8] The District Court properly found that there were no subsidiaries or affiliates involved in the instant dispute. But it does not follow from the regulations that less independent, less identifiable subdivisions of a corporate structure are to be treated more favorably than subsidiaries. If a "person" entitled to an allocation is a "business organization or legal entity", § 22(a), and not a subsidiary or affiliate thereof, the reasonable conclusion is that the various separate physical units of the entity are not entitled to individual consideration and individual allocations. Reliance on

deceptive corporate independence under these regulations is clearly denied to the affiliate and could not even be contemplated as to the primary corporation's working parts. The Oil Import Appeals Board subsequently had another occasion to review contentions similar to Murphy's and rejected these arguments:

"* * * during four months of the first allocation period for which Petitioner seeks a separate computation for Wrenshall (beginning January 1, 1968) this refinery existed as a corporate subsidiary and affiliate of Petitioner, clearly 'not eligible individually for an allocation' (Regulation 1, Section 4(g).) It would be ludicrous to interpret this interdiction as evaporating with the cessation of the subsidiary's corporate entity and to grant Wrenshall after its merger with the Petitioner a standing for seeking allocation on a separate basis which it did not have as a corporate subsidiary." In the Matter of Continental Oil Company, Oil Imports Appeals Board, Docket S-43, June 9, 1970.

Thus, we believe one allocation only is allowed to Murphy and its separate refineries are not in a position to claim separate consideration under this program.

Any contrary conclusion would violate and render ineffectual the sliding scale provisions of the regulations. 32A CFR Chap. X § 10(b).

The purpose of § 4(g)

"* * * was to protect the integrity of Section 10(b) of Regulation 1, which established a 'sliding scale' of allocations, depending on total volume of refinery inputs, as a result of which smaller refiners are authorized to import a larger percentage of their inputs than are larger refiners. Section 4(g) was designed to prevent corporations, which controlled other companies having refinery operations

---

8. § 4(g) has a rational basis consistent with the purposes of the Mandatory Oil Import Program. Skelly Oil Company

v. Udall, D.D.C.1968, 288 F.Supp. 109, 115, aff'd D.C.Cir., 1970, 436 F.2d 910.

from having such companies treated separately for allocation purposes, or from splitting up certain of their operations into separate corporate entities, as a result of which the controlling parent corporations in either case would be permitted multiple use of the 'sliding scale' thereby enjoying larger allocations of foreign crude oil than was intended." Skelly Oil Company v. Udall, D.D.C., 1968, 288 F.Supp. 109, 112 aff'd D.C.Cir., 1970, 436 F.2d 910.

By regulating the import quota of the larger refiners the regulations support and insure the program's objective will be met, i. e., domestic oil production and competition will be stimulated in order to lessen America's reliance on overseas imports. The President has determined that increased capability of smaller producers could best effectuate those ends. To grant separate allocations to each refinery of a large corporate complex would allow the larger percentage on the sliding scale to be used more than once by those corporate entities with more than one refinery. The result would be contrary to the clear direction of the program. A hypothetical large company with, for example a total of 100,000

B/D input would, under § 10(b), ordinarily be eligible for an input allocation as follows:

| | |
|---|---|
| First 10,000 barrels at 19% | 1900 B/D |
| Next 20,000 barrels at 10.2% | 2040 B/D |
| Remaining 70,000 barrels at 6.7% | 4690 B/D |
| Total Allocation | 8630 B/D |

However, if this same large company has ten refineries, each with an input of 10,000 B/D, and the company is permitted to obtain separate allocations for each refinery, the allocation for each of them under § 10(b) will then be 1900 B/D, and the company's total will be 19,000 B/D instead of the 8630 B/D allowed under the sliding scale. Consideration of the number of refineries that one producer operates is irrelevant and would distort the present program.

The provision of a Northern Tier floor is not contrary to the refusal to allow separate allocations for those with refineries both within and without that zone.[9] The express language of the Proclamation and the regulations does not require separate treatment of the refineries of an applicant when only one of its refineries is located within the Northern Tier.[10] No separate allocations have

---

9. The fact that only Murphy and possibly one other refiner is in this position today does not dictate an opposite conclusion. Corporate holdings are not unchanging and will be realigned especially if to the great advantage of the entity. Even if Murphy's argument would have minimal effect on the program today, its success would be dangerous precedent for the viability of the program in the future. See Eastern States Petroleum & Chemical Corporation v. Walker, S.D.Tex., 1959, 177 F.Supp. 328, 335.

10. Murphy Oil argues that the following language of § 10(a) requires separate allocations:
"* * * The Administrator shall make, to eligible persons having refinery capacity in these districts, allocations of such imports for the allocation period as provided in paragraphs (b) and (c) of this section." 32A CFR Chap. X § 10(a).
Paragraph (b) provides for the input allocation based on the sliding scale. Paragraph (c) allows the historical basis

computation and requires it to be used to determine the permitted quota if the historical basis is greater than the basis under paragraph (b). Part (2) of paragraph (c) also sets forth the rule concerning the role of Canadian oil in the computations and provides for the Northern Tier floor.

Despite § 10(a)'s use of the conjunctive ["paragraphs (b) and (c)"] these regulations do not support Murphy's argument. Clearly an "applicant" or "person" is entitled only to the larger of the two computations. Also, since "person" and "applicant", as used in the regulations, indicate that no sub-units of a corporation are entitled to an allocation, it follows that no one producer could be awarded an allocation based partly on paragraph (b)'s computation and partly on paragraph (c)'s computation.

The use of the word "shall" in § 10(a) does not dictate an opposite conclusion. "The interpretation of these words [shall and may] depends upon the background circumstances and context in which they

ever been made, whether or not some or all of a corporation's refineries were outside of the Northern Tier.

It is not necessarily unfair to treat an organization with a single refinery located in the Northern Tier differently from an integrated firm with a number of facilities, one of which is in the Northern Tier.[11] See In the Matter of Continental Oil Company, Oil Imports Appeal Board, Docket S-43, June 9, 1970. The integrated firm, such as Murphy Oil, has its allocations figured on the basis of combined input or history of all of its refineries, both within and without the Northern Tier. Due to multiple operations its import allocation can be larger than if it were solely a Northern Tier producer. The company with facilities only in the Northern Tier is without other sources to maintain or increase its quota since the Presidential Proclamations have had the goal of eventually placing most oil importers on the input basis for allocations. The producer with only a Northern Tier operation must rely on his historical basis since Canadian oil is not included in computing the input basis. Without the floor the Northern Tier company would be left with a low input basis and a low historical basis. Yet, Murphy is not in this perilous position because its quota is figured with combined data including the Meraux imports which means that the maintenance of an historical basis is not essential for its continued operations.[12]

Thus, it is clear that Murphy Oil has not been denied whatever benefit it was entitled to receive by way of the Northern Tier floor. Its import allocation was derived from the calculation of all three formulas: The input basis, the historical basis, and the historical basis with the benefit of the Northern Tier floor. The highest possible quota was based on inputs.[13] Again it must be emphasized that if Murphy were granted an extended separate allocation based partly on history the amount of oil available for allocation to the now favored smaller or newer importers would be reduced since the total imports allowed are a fixed quantity. Proclamation 3279, as amended, § 2(a) (1). Considering the disastrous effect on the program's purpose that Murphy's success would mean here and the fairness with which Murphy has been treated,[14] there are no "weighty reasons" upon which to overturn the Administrator's determination on this matter. See Doe, supra, 412 F.2d 674, 678. In reviewing regulatory action under the Oil Import

---

are used and the intention of the legislative body or administrative agency which used them." United States v. Reeb, 9 Cir., 1970, 433 F.2d 381. As indicated in the body of our opinion, the history and purpose of the Oil Import Program are inapposite to separate allocations for the refineries of one producer.

11. The Northern Tier refineries have been treated separately under other provisions. For example, their historical basis was to be reduced at a greater rate than others under Proclamation 3509. Of course, at that time no separate allocations were made.

12. The Oil Import Appeals Board also noted that "many multi-facility companies use the allocation earned by one plant for the benefit of another." Decision on the Petition of Murphy Oil Corporation, Oil Import Appeals Board, Docket Q-42, December 11, 1968. Testimony in the District Court also referred to this practice.

13. The Assistant Administrator of the Oil Import Administration testified that the calculations resulted in the following figures for Murphy in 1968: 4,174 B/D on the basis of inputs, 3,005 B/D on the basis of history, and 3,198 B/D on the basis of history but with the protection of the Northern Tier floor. In 1969 the figures would be, respectively, 4,153 B/D, 2,572 B/D, 2,830 B/D.

14. The provision for adjustments through the Oil Import Appeals Board "is a meaningful component of a regulatory scheme. Such provisions can ameliorate the rigors of mechanical application of the rules in appropriate cases without making the application of the rules unduly complex for the agency." Gulf Oil Corporation v. Hickel, D.C.Cir. 1970, 435 F.2d 440, 447.

Program the District of Columbia Circuit has emphasized that

" * * * Administrative agencies and officers have a primary task to administer broad policy mandates for the common good of our society, and they cannot be required to refine their rules to assure tailor-made equity for each of the complexities that may arise. If they issue and interpret regulations which are rational and supportable in their general application, they cannot necessarily be charged with unreasonableness because in particular applications the regulations and general interpretations may grind with a rough edge." Gulf Oil Corporation v. Hickel, D.C.Cir., 1970, 435 F.2d 440, 447.

We conclude that the following findings of fact by the District Court were clearly erroneous as without adequate evidentiary support and induced by an erroneous view of the law:[15] That the Administrator's method of application of the Oil Import Regulations, as amended, to Murphy Oil would be "arbitrary, confiscatory and discriminatory" and deny Murphy Oil equal protection of the laws; that Murphy Oil's allocation should be computed on a separate basis for each of its separate refineries; that an interpretative error was made in the computation of Murphy Oil's allocations since January 1, 1968; that the Oil Import Appeals Board was in error in denying Murphy's appeal. As discussed above, the conclusions of law based on these findings of fact must also be rejected. We hold the Administrator's ruling to be on a rational basis and valid.

Reversed and remanded.

MEHAFFY, Circuit Judge (dissenting):

I respectfully dissent and would affirm primarily upon the findings of fact and conclusions of the district court in its opinion reported as Murphy Oil Corp. v. Hickel, 307 F.Supp. 812 (W.D.Ark. 1969).

It is undisputed that Murphy Oil Corporation is an independent, integrated company with no affiliates or subsidiaries and neither controls nor is controlled by any other independent corporation, firm, business organization or legal entity. Thus, the literal language of § 4(g) of Oil Import Regulation 1 does not apply to Murphy if the plain language of this provision is adhered to. If the regulation had been intended to apply to a situation such as Murphy's, it would have been a simple matter for it to have been so written with the exception provided by Amendment 6 applicable to the Northern Tier refineries.

It is noted that Judge Harris' Finding of Fact No. 16 reads as follows:

"16. That Murphy Oil Corporation's refinery located at Superior, Wisconsin, is geographically isolated from domestic sources of crude oil supply. It is therefore dependent upon Canadian crude oil in order to provide and maintain an adequate feedstock for its Northern Tier refinery located at Superior, Wisconsin, in its efforts to compete with other Northern Tier refiners located within such restrictive geographical area." 307 F.Supp. at 815–816.

There are only six refineries within the three states comprising the Northern Tier. To deprive Murphy of the benefit of the floor accorded the other five refineries in this area simply because of its ownership of a refinery in a state outside the Northern Tier is not a requirement of the applicable regulations. Additionally, with Murphy's Northern Tier refinery dependent entirely on Canadian crude oil, the deprivement of this benefit discriminates against Murphy in its competition with the other Northern Tier refineries. If such discrimination does not deprive Murphy of equal protection of the law,

---

15. Rule 52(a), F.R.Civ.P., 28 U.S.C.A.; S. S. Silberblatt, Inc. v. Seaboard Company, 8 Cir., 1969, 417 F.2d 1043, 1055.

**426**

at least it violates the statement of intent of the regulations to provide to the extent possible for a fair and equal distribution among persons having refining capacity in these districts (Districts 1 to 4 and District 5). See Presidential Proclamation 3279, Section 3(b) (1) and as amended.

I am aware of the deference generally accorded the interpretation of a regulation by its agency, but it appears that here the interpretation which the majority follows reads something into the regulation that could easily have been put in plain language if that had been the intention.

While courts generally have great respect for administrative interpretations of their regulations, it is well known that Judge Harris by his long experience in Congress with extensive work in this field has much expertise, and I would adopt his findings and conclusions and affirm.