436 F.2d 910
 141 U.S.App.D.C. 180
 SKELLY OIL COMPANY
v.
Fred J. RUSSELL et al., Appellants.*
*Sitting by designation pursuant to Title 28, U.S.Code,
Section 292(c).
SKELLY OIL COMPANY, Appellant
v.
Fred J. RUSSELL et al.**
**Pursuant to F.R.A.P. Rule 43(c)(1) Fred J. Russell, Acting
Secretary of the Interior, has been substituted as a party.
 Nos. 22633, 22639.
 United States Court of Appeals, District of Columbia Circuit.
Argued Jan. 9, 1970.
Decided Dec. 3, 1970
 
 Mr. Walter H. Fleischer, Atty., Department of Justice, with whom Messrs. Thomas A. Flannery, now U.S. Atty., David G. Bress, U.S. Attys. at the time the brief was filed, and Robert V. Zener, Atty., Department of Justice, were on the brief for appellants in No. 22,633 and appellees in No. 22,639. Mr. Edwin L. Weisl, Jr., Asst. Atty. Gen., at the time the record was filed, also entered an appearance for appellant in No. 22,633.
 Mr. Daniel M. Gribbon, Washington, D.C., with whom Mr. Robert N. Sayler, Washington, D.C., was on the brief, for appellee in No. 22,633 and appellant in No. 22,639.
 Before BAZELON, Chief Judge, and MacKINNON* and ROBB, Circuit judges.
 ROBB, Circuit Judge:
 
 
 1
 Skelly Oil Company is a producer, refiner and marketer of petroleum products. Beginning in 1959 Skelly held allocations of imports of crude oil and licenses to import based on these allocations, granted by the Secretary of the Interior through his delegate, the Oil Import Administration. The allocations were made and the licenses issued pursuant to the Mandatory Oil Import Program established under Presidential Proclamation 3279 of March 10, 1959, 24 Fed.Reg. 1781, see 19 U.S.C. 1862 (1964) (Historical Note), and Oil Import Regulation 1, 32A C.F.R., Chapter X. However, on June 30, 1967 the Oil Import Administrator ruled that under Oil Import Regulation 1, Skelly was not entitled to a separate allocation to import crude oil. On December 19, 1967 the Administrator's determination was affirmed by the Oil Import Appeals Board. The ground of the ruling was that Skelly was ineligible for an allocation because it was controlled by the Getty Oil Company within the meaning of Section 4(g) of Oil Import Regulation 1.[1]
 
 
 2
 On February 2, 1968 Skelly filed in the district court an action for a declaratory judgment seeking reversal of the Administrator's ruling and a determination that it was eligible for an allocation of foreign crude oil. The district court sustained the decision of the Administrator and the Appeals Board that Skelly was ineligible for an allocation. Skelly Oil Company v. Udall, 288 F.Supp. 109 (D.D.C. 1968). Skelly appeals from this judgment.
 
 
 3
 In a separate decision on March 1, 1968 the Administrator ruled that Skelly was not entitled to import the balance of 461,464 barrels of crude oil which the Middle East crisis had prevented the company from importing under its 1967 allocation and license. After receiving this decision Skelly requested a hearing before the Administrator. As stated by Skelly the issue was whether it was 'entitled to reissuance of the unused portion of its 1967 import license'. The hearing was granted, and the matter was pending before the Administrator at the time of the trial of the declaratory judgment action in the district court. Although the issue was not raised by the pleadings or before him for decision, the district judge held that the Administrator's ruling of March 1, 1968, refusing to reissue any portion of Skelly's 1967 license, amounted to a revocation of the license and was invalid because it was not preceded by the hearing required under the provisions of Section 20 of Regulation 1.[2] The district court held further that even if Skelly were not eligible for a license, it might still be entitled to an allocation under Section 23 of the Regulation.[3] The Secretary and the Oil Import Administrator appeal from these rulings of the district court.
 
 
 4
 We affirm the district court's judgment sustaining the determination that Skelly was ineligible for an allocation, but we reverse the holding that the refusal to reissue the 1967 license was invalid.
 
 
 5
 The Mandatory Oil Import Program was established pursuant to Presidential Proclamation 3279 of March 10, 1959, 24 Fed.Reg. 1781. The program and its background have been described in two decisions of this court: Atlantic Refining Company v. Standard Oil Company, 113 U.S.App.D.C. 20, 304 F.2d 387 (1962); Pancoastal Petroleum, Limited v. Udall, 121 U.S.App.D.C. 193, 348 F.2d 805 (1965); see also Texas American Asphalt Corporation v. Walker, 177 F.Supp. 315 (S.D.Tex.1959).
 
 
 6
 In summary, the restriction of oil imports to the United States began with a voluntary program in 1957. The program was the result of an influx of cheap oil from the Middle East, which supplanted domestic oil and thereby discouraged or curtailed domestic exploration and production. When the voluntary program proved unsatisfactory the present mandatory program was instituted by Presidential Proclamation 3279, issued pursuant to statutory authority.[4] The statute, now 19 U.S.C. 1862(b) (1964), provides that when the Director of the Office of Emergency Planning[5] advises the President that he is of the opinion that an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security, the President, unless he makes a contrary determination, 'shall take such action * * * as he deems necessary to adjust the imports of such article * * * so that such imports will not so threaten to impair the national security'. Proclamation No. 3279 recites that the President has been advised and has agreed, pursuant to the statute, "that crude oil and the principal crude oil derivatives and products are being imported in such quantities and under such circumstances as to threaten to impair the national security'; . . .' 24 Fed.Reg. 1781, 19 U.S.C. 1862 (1964) (Historical Note).
 
 
 7
 So far as material here, the Proclamation directs that no crude oil shall be imported except by or for the account of a person to whom a license has been issued by the Secretary of the Interior pursuant to an allocation made to such person by the Secretary in accordance with regulations issued by him. Section 2(a)(1) of the Proclamation, as amended, instructs the Secretary, subject to certain adjustments, to set a maximum level of imports of crude oil at 12.2% Of the quantity of crude oil which the Secretary estimates will be produced during the allocation period (the previous year) in Districts I-IV.[6]
 
 
 8
 Two methods are used in allocating to refiners their share of the total amount of oil allowed to be imported. The basic allocation formula, authorized by Sec. 3(b)(1) of Proclamation 3279, grants domestic refiners a quota founded upon their refinery inputs for the previous year (or 'allocation period') and according to a sliding scale. See 32A C.F.R. Chapter X, 0I Reg. 1, 10. Thus, for 1967, in the districts of the country relevant here (Districts I-IV), refiners with an average input of 0-10,000 barrels per day (B/D) in 1966 received a 1967 allocation of 20% Of their 1966 refinery inputs; those with 10,000-30,000 B/D, 11.4%; 30,000-100,000 B/D, 8% And over 100,000 B/D, 4.28%. However, a person who imported crude oil pursuant to an allocation under the Voluntary Program may receive an allocation representing a percentage of his last allocation under the Voluntary Program, if that would exceed the allocation to which he would be entitled on the basis of refinery inputs. 32A C.F.R. Chapter X, 0I Reg. 1, 10(c). Allotments based on allocations under the Voluntary Program are known as 'historical' allocations.
 
 
 9
 The Secretary has been directed by the President to make a gradual reduction of historical allocations. E.g., Proclamation 3823, 2, 33 Fed.Reg. 1171, 1172 (1968). Accordingly, the Oil Import Regulations have steadily reduced the percentage of the last Voluntary Program allocation which may be granted to an importer. The reduction of historical allocations has produced a corresponding reduction in the number of persons granted allocations on an historical basis, and an increase in the number receiving allocations according to the sliding scale and on the basis of refinery inputs.
 
 
 10
 In applying the sliding scale it becomes important to determine whether a parent and its subsidiary shall be treated as separate entities; for if the inputs of a subsidiary and a parent corporation are treated as a single unit, their allocation based on their combined inputs may be less than the sum of their allocations would be if the two were treated separately.
 
 
 11
 Proclamation No. 3279, Section 3(b)(1), directs the Secretary to issue regulations to 'provide, to the extent possible, for a fair and equitable distribution (of allocations) among persons having refinery capacity * * * in relation to refinery inputs'. In carrying out this direction the Secretary, in Oil Import Regulation 1, 4(g), 32A C.F.R. Chapter X, has dealt with owned or controlled subsidiaries or affiliates.[7] The regulation provides that a company is not eligible individually for an allocation if it is 'a subsidiary or affiliate owned or controlled, by reason of stock ownership or otherwise', by another company. The controlling company and the owned company are regarded as one. Allocations for both companies will be made to the controlling company alone, but upon request, licenses will be issued to the subsidiary or affiliate.
 
 
 12
 On eight separate occasions between March 1959, when the Mandatory Oil Import Program took effect, and December 1966, the Administrator granted Skelly an allocation of foreign crude oil based on its refinery inputs. It appears that Skelly's right to this allocation was not questioned until late in 1966 when the Department of Justice called the Administrator's attention to the relationship between Getty and Skelly. As a result, in response to Skelly's application for a 1967 allocation the Administrator, on December 23, 1966, wrote Skelly that 'as you know, a question has arisen as to the application of paragraph (g), Section 4 * * *' and that 'in fairness * * * the matter should be further explored before reaching a final decision.' The letter added that 'under the circumstances we are issuing crude and unfinished oil licenses authorizing importation of 1,082,199 barrels * * *.' This quantity was about one-half of the allocation to which Skelly would have been entitled in 1967 on the basis of its 1966 refinery inputs, if Section 4(g) of Oil Import Regulation 1 were not applied.
 
 
 13
 Prior to 1967 Getty did not itself have an allocation of foreign crude oil since it was not a domestic refiner and had no history of importing under the voluntary program. In 1967, however, Tidewater Oil Company, which did have a substantial allocation on the basis of its history of importing, was merged with Getty. Getty succeeded to Tidewater's historical allocation and thereafter was entitled to allocations computed on the historical basis rather than on the basis of refinery inputs. The amount of this historical allocation exceeds the allocation attributable to the combined inputs of Skelly and Getty; and this being so, the result under Section 10(c)(1) of the Regulation[8] is that when Getty and Skelly are treated as one, Getty receives on behalf of itself and Skelly the same allocation to which it alone would be entitled as an historical importer; and Skelly receives no allocation.
 
 
 14
 On June 30, 1967 the Administrator held that under Section 4(g) Skelly was not entitled to a separate allocation because it was owned or controlled by Getty Oil Company, so that Skelly and Getty must be regarded as one entity.
 
 
 15
 On December 19, 1967, after a hearing, the Administrator's ruling was upheld by the Oil Import Appeals Board. The Board also rejected Skelly's request that it be granted an allocation under Section 21 of Oil Import Regulation 1, on the grounds of 'exceptional hardship' or 'special circumstances'. The Board held that 'the loss of a privilege to which Skelly is not entitled * * * does not constitute 'exceptional hardship' or 'special circumstances."
 
 
 16
 The corporate relationship between Getty and Skelly can be quickly explained. It is conceded that during the relevant period, 71.08% Of the capital stock of Skelly was owned by Mission Corporation. Substantially the only function of Mission Corporation was its ownership of Skelly stock. In turn, 64.77% Of the capital stock of Mission Corporation was owned by Getty Oil Company, so that Getty Oil had voting control of Skelly. Five of the nine members of Skelly's Board of Directors were also members of Mission Corporation's six-member board. Although none of Skelly's officers served as officers of Mission Corporation, four of Mission's officers were also officers of Getty Oil. Mr. J. Paul Getty, who was president of Getty Oil and owned approximately 78% Of its stock, was also president of Mission Corporation and a member of its board. In 1959 Mr. Getty personally selected the president of Skelly Oil Company, Mr. Don Miller. When Mr. Don Miller died in 1968 he was succeeded in office by Mr. Ernest Miller, a Director and Vice President of Getty Oil. The annual report of Getty Oil was a consolidated report which treated Skelly as a subsidiary.
 
 
 17
 The record discloses, and the district judge found, that Skelly had been operated as an independent company. Getty Oil had made no attempt, through its power to vote a majority of Skelly's stock, to control Skelly's management policy, decisions and operations. Nevertheless it is apparent, and the district court found, that Getty had the power to exercise such control.
 
 
 18
 Skelly contends that the Administrator's determination of its ineligibility for an allocation is invalid since (1) Skelly is not controlled by Getty in any respect that is significant to the objectives or administration of the Mandatory Oil Import Program; (2) an allocation to Skelly would not result in a double use of the graduated scale because Getty's allocation is on the historical basis; and (3) the determination does not provide 'fair and equitable' treatment for all refiners, as required by the Presidential Proclamation. Skelly argues further that if the Administrator was correct in holding that Section 4(g) of the Regulation rendered Skelly ineligible for an allocation, then the Regulation is unauthorized by the Proclamation and invalid. Finally, Skelly says that if Section 4(g) is valid and does require elimination of Skelly's allocation, then the Appeals Board abused its discretion in failing to award Skelly an allocation upon the ground of 'exceptional hardship' or 'special circumstances'. We are not persuaded by Skelly's arguments.
 
 
 19
 As we have said, it is conceded that Getty has the legal power to control Skelly; and if the standard of Section 4(g) of the Regulation is applied literally, it is plain that Skelly was ineligible for an allocation since it was 'a subsidiary or affiliate owned or controlled, by reason of stock ownership or otherwise' by Getty. Skelly argues, however, that since the operations of the two companies were so clearly independent of each other, there is no justification for invoking the control provisions of Section 4(g); that in the administration of the oil import program 'control' means a single integrated utilization of two or more allocations. This interpretation of the regulation was rejected by the Administrator.
 
 
 20
 The Administrator's interpretation was not arbitrary or unreasonable. The purpose of Section 4(g) is to prevent a company which controls another from increasing its allocation by adding to it the separate allocation of the company which it controls. Such a combination of allocations increases the parent company's share of the total quota of oil allowed to be imported. It increases a large company's competitive advantage over smaller refiners, contrary to the purpose of the sliding scale allocation scheme. Even though in practice the parent company does not in fact exercise control over its affiliate or subsidiary, it derives an economic benefit from the multiplication of allocations; and the benefit is not lessened because one of the combined allocations is historical and the other is based upon refinery inputs.
 
 
 21
 By adding Skelly's full quota based on refinery inputs to its own historical allocation, Getty would increase its share of the total quota of oil to the detriment of all other refiners and in derogation of important purposes of the oil import program. It was therefore not unreasonable for the Administrator to conclude, as the government suggests in its brief, that to permit the addition of Skelly's allocation to that of Getty would be to stand the oil import program on its head. Certainly we cannot say that Skelly's arguments to the contrary meet 'the burden facing one who seeks to overturn the interpretation and administrative application accorded by an administrative agency, that the interpretation is not reasonable and the application lacks rational foundation.' Pancoastal Petroleum, Limited v. Udall, 121 U.S.App.D.C. 193, 195, 348 F.2d 805, 807 (1965); see also Udall v. Tallman,380 U.S. 1, 16-18, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). Neither can we say that Section 4(g), as interpreted by the Administrator, is an invalid distortion of the direction in the Presidential Proclamation that there be a fair and equitable distribution of oil among refiners.
 
 
 22
 Skelly argues further that the Administrator's action is not 'fair and equitable' since it completely eliminates Skelly's allocation without increasing the allocation to Getty. We are told that Getty has refused to permit Skelly to share in its allocation so that 'Skelly came away with absolutely nothing.' It is suggested that the Administrator should not have imposed the entire burden of ineligibility upon Skelly, but should have allotted Skelly an equitable share of Getty's allocation. We think, however, that the distribution of Getty's quota between Getty and its subsidiary is a matter for the management of Getty to decide in the exercise of its judgment; it is not a problem which the Administrator is required to solve.
 
 
 23
 Skelly argues that the Oil Import Appeals Board abused its discretion in declining to grant Skelly an allocation under Section 21 of Oil Import Regulation 1.[9]
 
 
 24
 The Board concluded in the exercise of its discretion that:
 
 
 25
 'Skelly has made no showing of 'exceptional hardship' or 'special circumstances' justifying an additional allocation over and above the amount already received in the current allocation period. In short, Skelly has shown no 'exceptional hardship' or 'special circumstances' other than the bare fact that it will lose an allocation it previously enjoyed prior to discovery of its ineligibility. 'The loss of a privilege to which Skelly is not entitled (according to the Administrator's determination in which the Board concurs) does not constitute 'exceptional hardship' or 'special circumstances."
 
 
 26
 Assuming that the Board's action is subject to review we cannot say, in the circumstances of this case, that it was arbitrary, capricious or an abuse of discretion.
 
 
 27
 We now turn to the district court's ruling that the Administrator unlawfully refused to reissue the unused portion of Skelly's 1967 license.
 
 
 28
 Because of the troubles in the Middle East in 1967, many holders of import licenses were unable to use their 1967 allocations in full during that year. Skelly was one of these licensees; it was unable to import some 461,000 barrels of oil under its 1967 allocation and license.
 
 
 29
 On January 3, 1968 the Oil Import Administrator mailed to all 1967 licensees, including Skelly, a notice regarding 'proposed modifications of the oil import program including permitting all unused 1967 oil import allocations . . . to be carried over in succeeding allocation periods.' The notice advised all persons having unused expired licenses for 1967 who desired to carry imports over to return their old licenses to the Oil Import Administrator by January 22, 1968. In response to the notice Skelly returned its unused expired license.
 
 
 30
 On January 27, 1968, after the old licenses were returned, the President issued Proclamation 3823 (33 Fed.Reg. 1171). The Proclamation provided that in view of the disruption to petroleum supply and transport occasioned by the recent Middle East crisis, the Secretary of the Interior was authorized to make adjustments in allocations and licenses for the 1967 allocation period by permitting persons who did not fully use these licenses to use them during the calendar years 1968 and 1969.[10]
 
 
 31
 On February 16, 1968 Oil Import Regulation 1 was amended by the addition of Section 23, which provides in pertinent part:
 
 
 32
 '(a) Persons who did not fully utilize licenses to import crude oil . . . which were issued for Districts I-IV . . . under allocations made for the allocation period January 1, 1967, through December 31, 1967, and who return such partially used licenses to the Oil Import Administration within the time specified . . . will, without further application, have licenses reissued to them for the amounts of the unused portions of the returned licenses under the following terms and conditions: * *
 
 
 33
 '(3) Crude oil . . . licenses for Districts I-IV will be reissued in an amount equalling not more than 40 percent of the unused portions of the 1967 licenses for utilization during the calendar year 1968 * * * The balance (60 percent) of the unused portions of the 1967 licenses will be issued for utilization during the calendar year 1969 * * *.'
 
 
 34
 By letter of March 1, 1968 the Administrator informed Skelly that its 1967 license would not be reissued. Explaining his position, the Administrator stated:
 
 
 35
 'In June of 1967 a decision was rendered that Skelly Oil Company is ineligible for an allocation of imports of crude oil and unfinished oils. Section 23 of Oil Import Regulation 1 (Revision 5), as amended, applies only to licenses held by eligible persons. It is not intended to extend the time during which an ineligible company avails itself of the benefits of an allocation. In short, Skelly's ineligibility removes it from the ambit of section 23 of the oil import regulations. 'Accordingly, the unused portion of your 1967 oil import license will not be reissued. If, however, you wish to be heard on this point, please advise and we will be glad to arrange for a hearing at a time convenient to both of us.'
 
 
 36
 Accepting the Administrator's invitation, Skelly requested a hearing 'on the question as to whether it is entitled to the reissuance of the unused portion of its 1967 Oil Import License'. The hearing was held before the Administrator June 12, 1968. Skelly was represented by counsel who argued the matter and submitted exhibits and a written statement of Skelly's position. In a written opinion issued July 31, 1968 the Administrator adhered to his decision of March 1, 1968.
 
 
 37
 The first ground of the district court's ruling was that the Administrator's decision 'was a pro tanto revocation of Plaintiff's 1967 license and invalid because it was not preceded by the hearing required under the provisions of Section 20 of Regulation 1'. We cannot accept the conclusion that the Administrator's action was a revocation or suspension of the license. In our view that action was a refusal to resurrect and extend an expired license. Formal revocation proceedings were therefore not required. See Hamlin Testing Lab., Inc. v. A.E.C., 357 F.2d 632, 638 (6th Cir. 1966). In any event, after notifying Skelly that he did not intend to reissue its license, the Administrator granted the hearing requested by Skelly. At the hearing Skelly was represented by counsel who argued the legal issues presented by the undisputed facts. Skelly made no objection to this procedure or any request for a different or more formal hearing. 'Procedural objections to the action of an administrative agency or trial court must be timely made to give the tribunal an opportunity to correct the error, if error there be; such contentions cannot first be made on appeal.' Brotherhood of Rail. Trainmen v. Chicago, M., St. P. & P.R. Co., 127 U.S.App.D.C. 58, 61, 380 F.2d 605, 608, cert. den., 389 U.S. 928, 88 S.Ct. 289, 19 L.Ed.2d 279 (1967).
 
 
 38
 Assuming that the district court properly considered the merits of the Administrator's refusal to reissue Skelly's license, we think that refusal should have been sustained. We cannot say that the Administrator's interpretation and application of Proclamation 3279 and Oil Import Regulation 1 were unreasonable.
 
 
 39
 The district judge held that under Section 23 of Oil Regulation 1, Skelly might be entitled to an import license even though it was not eligible for an allocation. We cannot agree. A reasonable interpretation of Proclamation 3279 and Oil Import Regulation 1 is that eligibility for an allocation is a prerequisite to the issuance of a license. Thus, Section 1(a) of Proclamation 3279 forbids the importation of crude oil except 'by or for the account of a person to whom a license has been issued by the Secretary of the Interior pursuant to an allocation'. Likewise Section 7(a) of Oil Import Regulation 1 provides that 'when an allocation has been made to a person under this regulation, the Administrator shall issue a license or licenses based on the allocation * * *'. Further, allocations and licenses are granted for 'an allocation period', which is defined by Section 3(a) of the Regulation to mean a period of twelve months beginning on January 1.
 
 
 40
 In short, there was a rational basis for the Administrator's conclusion that, being ineligible for an allocation, Skelly was not entitled to a license; and that the Presidential Proclamation and Section 23 of the Regulation did not confer or create eligibility where none existed. Skelly's 1967 license expired at the end of that year. Thereafter the Administrator reasonably found that the license was based upon an allocation to which Skelly was not entitled. In this situation the Administrator was not arbitrary or capricious in refusing to grant Skelly additional benefits under a license which had expired and which should not have been issued in the first place. Here again Skelly has failed to sustain the burden of demonstrating that the Administrator's interpretation and application of the Proclamation and the Regulation are unreasonable and lacking rational foundation. Pancoastal Petroleum, Limited v. Udall, 121 U.S.App.D.C. 193, 195, 348 F.2d 805, 807 (1965); see also Udall v. Tallman, 380 U.S. 1, 16-18, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).
 
 
 41
 We affirm the district court's judgment sustaining the determination that Skelly was ineligible for an allocation. We reverse the judgment holding unlawful the Administrator's decision of March 1, 1968, by which he refused to reissue Skelly's license.
 
 
 
 *
 Circuit Judge MacKinnon did not participate in the disposition of this appeal
 
 
 [1]
 Oil Import Regulation 1, 4(g) 32A C.F.R., Chapter X:
 'A person is not eligible individually for an allocation of imports of crude oil . . . if the person is a subsidiary or affiliate owned or controlled, by reason of stock ownership or otherwise, by any other individual, corporation, firm or other business organization or legal entity. The controlling person and the subsidiary or affiliate owned or controlled will be regarded as one. Allocations will be made to the controlling person on behalf of itself and its subsidiary or affiliate but, upon request, licenses will be issued to the subsidiary or affiliate.'
 
 
 [2]
 Section 20 provides in part:
 'Revocation or suspension of allocations or licenses. 'The Administrator may, after a hearing, revoke or suspend any allocation or license issued under this regulation, on grounds relating to the national security, or the violation of the terms of Proclamation 3279, this regulation, or licenses issued pursuant thereto.'
 
 
 [3]
 'Sec. 23. Reissuance of unused portion of 1967 licenses
 '(a) Persons who did not fully utilize licenses to import crude oil and unfinished oils or finished products which were issued for Districts I-IV and for District V under allocations made for the allocation period January 1, 1967, through December 31, 1967, and who return such partially used licenses to the Oil Import Administration within the time specified in paragraph (b) of this section will, without further application, have licenses reissued to them for the amounts of the unused portions of the returned licenses under the following terms and conditions:
 '(3) Crude oil and unfinished oil licenses for Districts I-IV will be reissued in an amount equalling not more than 40 percent of the unused portions of the 1967 licenses for utilization during the calendar year 1968 and one-half of this quantity will be issued in licenses bearing an expiration date of July 31, 1968, and one-half will be issued in licenses bearing an expiration date of December 31, 1968. The balance (60 percent) of the unused portions of the 1967 licenses will be issued for utilization during the calendar year 1969 and one-half of this quantity will be issued in licenses bearing an expiration date of July 31, 1969, and one-half will be issued in licenses bearing an expiration date of December 31, 1969. However, if 40 percent of an unused 1967 license will result in a person's receiving a license for less than 300,000 barrels, such person will be issued a license at a percentage in excess of the 40 percent limitation but in no event in an amount in excess of 300,000 barrels for importation during the calendar year 1968 and the balance, if any, will be licensed for importation during the calendar year 1969.
 '(b) Licenses will be issued under paragraph (a) of this section only with respect to partially used 1967 licenses which are returned to the Oil Import Administration before February 20, 1968.'
 
 
 [4]
 The Proclamation was issued pursuant to Section 2 of the Act of July 1, 1954 as amended, 72 Stat. 678, 19 U.S.C. 1352a (1958). Section 2 of the Act of July 1, 1954 was repealed by Pub.L. No. 87-794, Title II, 257(f), October 11, 1962, 76 Stat. 882; however, Section 257(f) of the Act of October 11, 1962, provides in part that: 'Any action (including any investigation begun) under such Section 2 before the date of the enactment of this Act (October 11, 1962) shall be considered as having been taken or begun under Section 232' of the Act of October 11, 1962. Section 232 of the Act of October 11, 1962 is 19 U.S.C. 1862 (1964)
 
 
 [5]
 The name of the Office of Emergency Planning was changed to the Office of Emergency Preparedness by Pub.L. No. 90-608, ch. IV, 402, October 21, 1968, 82 Stat. 1194
 
 
 [6]
 'Districts I-IV', as defined in the Proclamation, means the District of Columbia and all of the States of the United States except Arizona, Nevada, California, Oregon, Washington, Alaska and Hawaii. The 'allocation period' means the preceding year. 19 U.S.C. 1862 (1964) (Historical Note)
 
 
 [7]
 See footnote 1
 
 
 [8]
 Section 10(c)(1) provides:
 '(c)(1) Except as provided in subparagraph (2) of this paragraph, if an eligible applicant imported crude oil pursuant to an allocation under the Voluntary Oil Import Program and if an allocation computed under paragraph (b) of this section would be less than 30 percent of the applicant's last allocation of imports of crude oil under that program expressed in average barrels daily multiplied by 365, the applicant shall receive an allocation under this section equal to 30 percent of his last allocation of imports of crude oil under that program expressed in average barrels daily multiplied by 365.'
 
 
 [9]
 Section 21(b) provides:
 '(b) The Appeals Board shall consider petitions by persons affected by this regulation and may, within the limits of the maximum levels of imports established in section 2 of Proclamation 3279, as amended:
 '(1) Modify any allocation made to any person under this regulation on the grounds of exceptional hardship or error;
 '(2) Grant allocations of crude oil and unfinished oils in special circumstances to persons with importing histories who do not qualify for the allocations under this regulation;
 '(3) Grant allocations of finished products on the grounds of exceptional hardship to persons who do not qualify for allocations under this regulation; and
 '(4) Review the revocation or suspension of any allocation or license.'
 
 
 [10]
 Proclamation 3823 provided that:
 'WHEREAS, I find and determine that in view of the disruptions to petroleum supply and transport occasioned by the recent Middle East crisis, the Secretary of Interior should be authorized to make certain adjustment with respect to allocations of imports and licenses for imports of crude oil, unfinished oils, and finished products . . .. 'Because of disruptions in petroleum transport and supply resulting from recent actions in the Middle East, the Secretary is authorized to provide the persons who did not fully utilize licenses . . . for the allocation period January 1, 1967 through December 31, 1967 may utilize such licenses during the calendar years 1968 and 1969 * * * and notwithstanding the levels established in section 2 of this proclamation, the Secretary is authorized to make such adjustments in allocations of imports of crude oil, unfinished oils, and finished products as he deems necessary.'
 
 
 [33]
 Fed.Reg. 1171, 1173